CARRIE B. COBB, APPELLEE, v. NANNIE C. MACFARLAND, EXECUTRIX, APPELLANT.

FILED JUNE 29, 1910. No. 15,904.

1. **Wills: ELECTION.** No general rule can be formulated defining what acts of acceptance or acquiescence shall be sufficient to constitute an election between a devise in a will and a right inconsistent with the will. There must be an intention to make an election or some decisive act that will prevent restoring the parties affected to the same situation as if such act had not been performed.

2. ———: ———. An attempt to take both the property given by the will and the right inconsistent with the will does not constitute an election; when one is taken and the other rejected there is an election; if one is taken, and the situation of the parties affected is so changed with reference to the property or rights involved that they cannot be restored to their former situation, the election is complete.

3. ———: PAYMENT OF MORTGAGE: PRIOR CONVEYANCE. The provision in a will that the mortgage upon a certain tract of land shall be paid out of the estate is not inconsistent with a former contract by the testator to convey the land to another.

4. **Statute of Frauds:** SALE OF LAND: PAROL CONTRACT: PART PERFORMANCE. The effect of section 6 of the statute of frauds (Comp. St. 1909, ch. 32) is to continue the practice by which at the time of enacting the statute courts of equity compelled the specific performance of parol contract to convey real estate for the purpose of preventing fraud and injustice when there has been a part performance.

5. **Evidence:** STATEMENTS OF DECEDENTS. Testimony as to statements made by a deceased person many years before the testimony is given must be scrutinized closely; but when it appears that the circumstances were such that the parties testifying must have given close attention to the statements when made, and to the exact meaning of the party who made them, and strongly indicate the reasonableness and probability of the statements, and the statements are against the apparent interest of the party making them, such evidence may be sufficient to establish the fact stated.

6. **Statute of Frauds:** SALE OF LAND: PAROL CONTRACT: PART PERFORMANCE. Payment of the consideration for the conveyance of real estate, the purchaser being in possession at the time of

such payment and continuing in possession and making valuable, permanent improvements on the land without any agreement as to the terms of such possession, will be such part performance as to take the contract to convey out of the statute of frauds.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Affirmed.*

*Hall, Woods & Pound,* for appellant.

*Field, Ricketts & Ricketts, contra.*

SEDGWICK, J.

On the 5th day of July, 1905, Judge Amasa Cobb died in Los Angeles, California. At the time of his death he held the legal title to 1,040 acres of land in the township of Denton, Lancaster county, Nebraska, and other property. The only heirs to survive him were his daughter, the defendant Mrs. Nannie C. Macfarland, and two grandsons, Frank S. Cobb and Gilbert A. Cobb, children of his deceased son, Moffitt McKinney Cobb, and his son's widow, Mrs. Carrie B. Cobb, the plaintiff herein. He left a will by which he devised to his daughter, Mrs. Macfarland, an undivided one-half of the above mentioned land, and to each of his said grandsons an undivided one-fourth, subject to life estate to their mother, the plaintiff herein. The estate devised to the plaintiff was one-third of the one-half devised to her two boys to be held by her during her life. The defendant Nannie C. Macfarland is the executrix of her father's will. In 1896 Moffit McKinney Cobb was county treasurer of Lancaster county. It was discovered that there was a shortage in his accounts, and he and his sureties were notified of this shortage and required to make settlement. Amasa Cobb was one of the sureties on his official bond. The plaintiff in her petition alleged that the deficit was $48,088.61, and that the said Amasa Cobb as one of said sureties upon said bond was personally liable for the payment of said deficit, and that about this time Moffitt McKinney Cobb died and left poli-

cies of life insurance payable to this plaintiff, and that she collected thereon, together with the proceeds of certain personal property belonging to the plaintiff, an amount aggregating about the sum of $16,000, and that Amasa Cobb, to induce the plaintiff to give to him the said money to meet his liability on the bond of Moffitt McKinney Cobb, "promised the plaintiff he would bequeath and devise unto the said plaintiff, absolutely," the farm which she then occupied, being 800 acres of the land above ,mentioned; that she let Amasa Cobb have the $16,000 and the same was used by him in settling his liability upon the said bond, and she asked for a judgment "that it be decreed that the said Amasa Cobb was bound to leave by his last will and testament to the plaintiff above named, absolutely," the said 800 acres of land, and that the contract between the plaintiff and the said Amasa Cobb be specifically enforced, and plaintiff vested with the title to said land and the same be quieted in the plaintiff. The trial court found for the plaintiff and entered a decree accordingly, and the defendant appeals.

The principal question presented in the case is as to the sufficiency of the evidence to establish the contract relied upon. The defendant presented several questions of estoppel and election which she insists ought to defeat the plaintiff's claim.

1. The said 1,040 acres of land consist of two tracts, one of 800 and the other of 240 acres. Both of these tracts for several years prior to the death of Moffitt McKinney Cobb were occupied and farmed by him and his wife, this plaintiff. They cannot be said to be adjoining, but they are contiguous, the southeast corner of the smaller tract touching the northwest corner of the larger one. Soon after the death of Amasa Cobb negotiations were begun for the sale of the smaller tract of land, and it appears from the evidence that the plaintiff participated in those negotiations and was anxious that the sale be made. She wrote several letters to the defendant, apparently seeking to promote this sale, and finally, when it was ac-

complished, she and her two sons participated in the proceeds, in accordance with the provisions of the will. It is insisted by the defendant that this action on the part of the plaintiff estops her now to claim adversely to the provisions of the will. It is a fundamental principle of law that one who accepts a beneficial interest under a will thereby adopts the whole will, and renounces every right or claim that is inconsistent with the will. This is a principle of universal application, and it extends so far that, when a testator in his will disposes of property which belongs to a third party and at the same time makes provision for that third party in his will, the party whose property is so wrongfully disposed of cannot accept the provision made for him in the will, without allowing his property to be disposed of as the will provides. *Jennings v. Jennings,* 21 Ohio St. 56. The plaintiff is asking to enforce an alleged contract by which she is to have the 800-acre tract, absolutely, contrary to the provisions of the will. At the same time she has claimed and received under the provisions of the will her portion of the proceeds of the remaining tract of land. There is no doubt that the plaintiff must elect which course she will pursue. She now insists that this action on her part does not amount to an election. She alleges that she was not fully informed of her rights at the time she received the proceeds of the sale of this land, and that before the land was sold she had taken decisive action to enforce this contract upon which she now sues, and has never desisted from her determination to insist upon this contract. She offers to return the money which she received as a part of the proceeds of the sale of the land, and asks that she be allowed to do so, if the court shall find that her action in that regard interferes with her right to elect to enforce the contract she now sues upon. The trial court found in her favor upon this issue, and required her to return the money which she received from the proceeds of the sale of the land. In this finding we think the trial court is right.

It appears that after the death of Amasa Cobb the

plaintiff consulted with Mr. A. E. Harvey, a former partner of Judge Cobb, and a prominent member of the bar of this state, and then a member of the firm of Harvey & Harvey, engaged in the practice of law at Lincoln, Nebraska. In March, 1906, a petition was prepared for plaintiff to begin an action in the district court for Lancaster county to enforce the contract herein sued upon. This petition the plaintiff left with her attorneys, Harvey & Harvey, and she testifies that she supposed that that began the proceedings, and that she did not know that there was anything further necessary for her to do until she was further notified by her counsel, and that she was told by her attorneys that the sale of the 240-acre tract and participating in the proceeds by her would in no way interfere with her enforcement of the contract herein sued upon, and that she never elected nor intended to elect to take what was given her by the terms of the will in lieu of her right to enforce this contract. We think the evidence fully justifies this contention. The deed of 240 acres was signed by some of the parties on the 8th day of June, 1906, and was acknowledged by this plaintiff and others on the 6th day of July, 1906, several months after she supposed she had begun proceedings upon this contract. In the nature of things, no general rule can be formulated defining what acts of acceptance or acquiescence shall be sufficient to constitute an election. In each case presented the question arises whether it was intended to make an election and whether all parties can be restored to the same situation as if the act which it is claimed constitutes an election had never been performed, and these considerations generally control unless such inquiries are precluded by lapse of time or other special circumstances in the case. *Medill v. Snyder*, 61 Kan. 15; *Bierer's Appeal*, 92 Pa. St. 265; *Goodrum v. Goodrum*, 56 Ark. 532. Under the advice of her counsel it may fairly be said that the plaintiff attempted to take both the land given her by the will and the land she claimed to be entitled to under the alleged contract. This was done under

a mistake as to her rights, but if it had been done purposely and intentionally it could not be said to be an election. An attempt to take one and reject the other is an election, but an attempt to take both cannot be said to be. *Huston v. Cone,* 24 Ohio St. 11. The plaintiff cannot be said to have elected to take her share of the proceeds of the sale of the 240-acre tract as given her by the will in lieu of her right to the other tract of land under her alleged contract, unless in taking the proceeds of the sale she acted in full knowledge of her rights and intended by that act to choose the one rather than the other. *Millikin v. Welliver,* 37 Ohio St. 460.

2. It appears that at the time of the death of Amasa Cobb his land in Denton township was subject to a mortgage of $4,000, and after his death the defendant, as executrix of his will, paid the mortgage out of funds in her hands as such executrix, and this she alleges she would not have done had she known that the plaintiff would attempt to enforce her alleged contract for the 800 acres of land. We do not think there is any merit in this contention. The determination of the main question in the case must determine this matter also. If there was a contract that this plaintiff should have the land, it was the land itself that she was to have, and not an equity therein subject to a mortgage. The provision therefore of the will that this mortgage should be paid by the executrix thereof is not inconsistent with the existence of the contract alleged by the plaintiff.

3. The defendant contends that the plaintiff has failed to prove the contract upon which she sues. The first question discussed in this contention is whether the statute of frauds applies. Are contracts to make a will devising real estate within the exception of section 4 of that statute? It is urged that, since under section 4 (Comp. St. 1909, ch. 32) a nuncupative will may dispose of real estate, an agreement to make such disposition is excepted from the statute and may be proved by parol evidence. In many decisions of this court it has been assumed that

a contract to dispose of real estate by will is within the statute of frauds, and cannot be established by parol evidence, unless there has been such part performance as will bring it within section 6 of the statute. That section provides: "Nothing in this chapter contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreements in cases of part performance." By this section the legislature undoubtedly intended to recognize and continue the practice which then obtained in courts of equity to compel the specific performance of oral contracts to convey real estate for the purpose of preventing frauds and injustice where there has been a part performance. Other courts have held that contracts to dispose of real estate by will are within the statute of frauds. *Gould v. Mansfield*, 103 Mass. 408; *Hamilton v. Thirston*, 93 Md. 213; *Hale v. Hale*, 90 Va. 728. In New York a statute similar to ours has been so construed. *Gooding v. Brown*, 35 Hun (N. Y.) 148; *Ludwig v. Bumgart*, 48 App. Div. (N. Y.) 613. We do not find it necessary in this case to review the authorities for the purpose of ascertaining whether this court has been in error in assuming this to be the rule. Does this evidence show that such a contract as alleged was made, and, if the statute applies, that there has been such part performance as to take this case out of the provision of the statute?

One of the parties being prevented from testifying by death, the law forbids the other to testify to any transactions between them. The defendant contends that the plaintiff has not shown that she received more than $10,-000 upon her life insurance, nor that more than that amount was necessary to make the settlement with the county in addition to the money which the evidence shows was received from other sources and used for that purpose, and also that the value of the 800 acres of land was greatly in excess of the amount furnished by the plaintiff in making settlement. The plaintiff testified that she received from the Fraternal Aid Association $2,000, from

the American Order of United Workmen $2,000, from the Bankers Life of Des Moines $3,500, from another company, which she thought was the Preferred Accident Association of New York, $5,000, and from the Mutual Reserve Fund Life Association of New York $2,500, amounting to $15,000, besides some other money which she had from other sources, and that the amount that she furnished in making a settlement with the county was something over $16,000. In fact, the plaintiff only received $300 from the Preferred Accident Insurance Company of New York, and upon her cross-examination she was questioned and answered as follows: "Q. Don't you think you are mistaken about the payment of this $5,000 by the Preferred Accident of New York? A. No, sir. Q. You are still sure, are you, that that draft was turned over at General Cobb's office at the same time the draft for $3,500 was turned over? A. Yes, sir, $8,500. Q. Don't you think you might be mistaken? A. No, sir; I don't; because when you turn over that amount of money you know it. Q. You made no memorandum of that? A. It is a thing I could not forget. Q. You made no memorandum of it at all? A. No, sir; I made no memorandum."

The defendant's counsel insist that this positive testimony, which is shown by the record to be incorrect, casts great discredit upon the whole testimony of the plaintiff. We do not so regard it. In her first statement as to the money received from the respective insurance companies she said: "I can give you the amounts, but I would not say I can give the names of the companies just right. * * * We settled with one insurance company for $5,000; if I remember right it was the Preferred Accident of New York," and in this cross-examination it seems plain that she thought it was in regard to the amount of money that she had received that she was being interrogated, and not in particular as to the names of the companies from which she received it. The plaintiff was many times upon the witness stand during the trial of the case, and was questioned at large in regard to the various matters involved,

and, notwithstanding that she was greatly interested in the result of the litigation, her testimony appears to be candid and consistent. No record was kept of the transactions, and it was not to be supposed that she would be able to remember the names of the different companies and the exact amounts she received from each with the same accuracy that she would recollect the amount that it was necessary for her to furnish in order to enable her father-in-law to make the desired settlement, and the amount accordingly paid by her for that purpose. We find nothing in the record to discredit her testimony upon these matters, supported as it is by so many well-established circumstances.

The defendant contends that the whole amount of shortage to be supplied was $36,088.61, while the plaintiff alleges it to have been over $48,000. Mr. McClay was first appointed administrator of the estate of Moffitt McKinney Cobb, and he testifies that the amount of shortage demanded by the county was $46,000, and that afterwards the county made the concession of $2,000, reducing the amount claimed to $44,000; that the amount paid to the county from the sale of the auditorium lots through Mr. Boggs was $13,540.56, and that the sureties on the bond paid $10,730. If these figures are correct, it would leave the sum of $21,724 to be paid from other sources. A part of this was paid from the estate of Moffitt McKinney Cobb. His personal property had been mortgaged to secure this shortage, and the evidence shows that in this mortgage was included property that belonged to this plaintiff. The plaintiff took the mortgaged property and settled with the county therefor. It is perhaps difficult to determine from the evidence exactly how much money the plaintiff furnished from her life insurance and other sources. She had great confidence in Judge Cobb and greatly respected his opinions and wishes. She was manifestly justified in this, as the whole record shows that in the midst of the most trying and embarrassing circumstances he conducted the whole matter with the strictest

integrity, and manifested that he was actuated by the most honorable motives. He was determined that the county should suffer no loss upon his account, nor because of the transactions of his son, and whether or not he promised her as she says, she listened to his advice and was governed by his wishes.

As to the value of the land at the time of the transactions in question, the evidence, as is usual in such cases, is more or less conflicting. It appears that the land is somewhat inferior in quality, and it also appears that in 1896 when the settlement was made there were very few transactions in real estate and sales of farm land were not frequent. The plaintiff called many witnesses who were familiar with these lands and were from experience qualified to give an opinion of their value, and who testified that the land at that time was worth from $12 to $15 an acre. The defendant also called witnesses who were in position to give opinion in regard to the value of these lands, and who generally fixed the value between $20 and $30 an acre. From the whole testimony it may be said that the land was probably at that time worth from $12 to $18 an acre. However, all of the witnesses agree that it was difficult, if not impossible, to sell land at that time for its real value, and if it had been necessary to sell this land to satisfy the demands of the county, it is doubtful whether as much as $15,000 could have been realized from it. It seems clear from the evidence that the amount of money furnished by the plaintiff toward the settlement with the county was not so disproportionate to the actual value of the land as to render the contract which she alleges an unreasonable one.

It is contended that there is not sufficient evidence to prove the alleged promise, nor to prove such part performance on the part of the plaintiff as to take the contract out of the statute of frauds. There is a large mass of testimony as to the negotiations and settlement with the county, and as to the part which Judge Cobb took in the whole of this transaction, and as to his declarations and

30

statements after he received this money from the plaintiff, and of his promise to her to give her the farm in question in consideration of the money which he had so received.    These witnesses were testifying to conversations that took place with the deceased person more than ten years prior to the giving of their testimony.    It is always held that such testimony is to be examined very closely. The frailty of human memory is such that it is generally difficult, and frequently impossible, to reproduce the exact meaning intended when the statements were made.    We should look at the conditions under which the statements were made, and inquire whether there is anything in the circumstances and the relations of the parties tending to fix the real meaning of the statements in the minds of those who heard them.    The evidence shows that this shortage in the accounts of the county treasurer, and his tragic death soon after the shortage had been discovered, and its effect upon his father, who had long been a man of prominence in the state, a general in the army, and for many years a judge of this court, were matters of great importance and of general interest.    It also appears from the evidence that it was generally known that it had been proposed and contemplated that this plaintiff should devote her money to the settlement with the county, leaving herself and her two children substantially without support, and many friends of Judge Cobb, his former partner, Mr. Harvey, his family physician, and many others of his intimate friends, men of high character and standing in the community, consulted with Judge Cobb in regard to the matter.    These men testify that Judge Cobb assured them that he had no other means with which to make this settlement with the county; that to sell the land for that purpose would be a great sacrifice under the conditions then existing; that the plaintiff had consented to turn over this money to complete this settlement, and that she would lose nothing by it; that in return for this money she was to have the farm on which she lived.    To some of these men he said that he had

promised her the farm; to others he said that she and her children would have the farm; to others he said that he had given her the farm. Several of these witnesses testify positively that the amount he so stated to have been furnished by the plaintiff was $16,000. The volume of evidence in this record tending to establish the contract sued upon, together with counter evidence, is so great that we cannot extend this opinion to attempt an analysis of the evidence given by the various witnesses. It is very clear from this evidence that, during and after the time that this settlement was pending, Judge Cobb expected that this plaintiff would have the farm in question, and we think that the whole evidence taken together proves that he promised that she should have it in consideration of the money furnished by her in making the settlement.

It is insisted that the evidence does not show a sufficient part performance to take this contract out of the statute; that the payment of the purchase price alone is not sufficient. Payment of the purchase price and possession by the purchaser under the contract is generally, if not universally, held to be sufficient part performance. This plaintiff and her husband were in possession of this land for many years prior to his death, and after his death she continued in possession. The relation that they sustained to this land does not appear to be the ordinary relation of tenancy, and the evidence is not clear that it was understood and agreed by the parties that the possession of the plaintiff was under the contract sued upon. A contract to dispose of property by will assumes that the promisor is to have the use of the property during his life. The plaintiff made valuable improvements upon the land after the contract in question was made, and was never interfered with or questioned in her management of the property as owner. We think that the circumstances shown, together with full payment for the land, are sufficient under section 6 of our statute of frauds.

It is strenuously and fervidly maintained upon the oral argument that the whole life and character of Judge Cobb,

as reflected in this evidence, were inconsistent with the idea that, after making such a promise to this plaintiff, he could have been induced to make a different provision in his will. Soon after the death of his son he went to California, where his daughter, the defendant, was residing, and finally in 1901 he appears to have made that his permanent home. He was more than 80 years of age, in feeble health, and a man of kind heart and generous disposition. While he was living in Los Angeles with the defendant he gave her a large amount of property, aggregating, according to this evidence, considerably more than $20,000. In the will that was probated he gave her one-half of the 1,040 acres of land in Denton township, and all of the residue of his property, amounting to several thousand dollars.

It is useless to speculate as to the change in his purpose. If he considered at the time that he was merely expressing his intentions as to the future, and that those intentions might be changed, if afterwards upon change of circumstances and environment he should regard his duty in a different light; or if in his advanced years and feeble condition he lost interest in business matters, and did not consider the importance of the transactions in which he participated, the result is the same. The will was not a sudden caprice. He wrote and signed a similar will soon after he began visiting in California, in 1898, and that will appears also to have been preserved. We cannot agree with counsel that if the contract sued upon is established it reflects upon the integrity of Judge Cobb in making the will. No such conclusion is necessary upon this record. It is unnecessary to determine the cause or causes that resulted in the insertion of these ineffectual provisions in the will. It is enough to know that the right to this land was in another, and that the will could not change this right.

The judgment of the district court is right, and is

AFFIRMED.

LETTON and ROOT, JJ., dissenting.

The plaintiff's right to the relief she asks is predicated upon the existence of a contract between her and General Cobb that he would convey the entire tract of land sued for in return for the surrender to him and the sureties of her husband of the money from the life insurance policies of which she was the beneficiary. We are convinced from a careful reading of the testimony that no definite contract has been proved. No one has testified to the terms of the contract declared upon in the petition. The testimony concerning General Cobb's declarations is in many respects proof of testamentary intentions merely. A number of witnesses testify to such expressions as that "he always intended the farm to go to Mrs. Cobb and children;" "he intended the farm for Mrs. Cobb and the boys;" that when he was dead the farm "was to belong to Mrs. Cobb and the boys;" "I have given that farm to Carrie. Then he said something about Carrie and the boys having the farm." While other witnesses testify that, in speaking of the surrender of insurance money by Mrs. Cobb, the deceased said: "She would lose nothing by it. She was to get the farm that he intended Maxey to have." "He intended to give it (the farm) to Mrs. Cobb." "He intended the farm now for Maxey's wife and children." "Mrs. Cobb was going to have the farm and boys to have their share." "I have told her she will have the farm." "The farm goes to Carrie because she has furnished us her life insurance money to help settle with the county." "Carrie turned over her insurance and I gave her Maxey's farm."

It seems to us, upon the entire record, that the mind must remain in doubt as to whether a contract was made, or, if made, whether it contemplated devising or conveying this land to the plaintiff or to the plaintiff and her sons. The evidence fails to prove with any certainty the existence of the contract alleged, and it also fails to point out definitely the specific tract of land to which the language used by General Cobb was meant to be applied.

Furthermore, the declarations of the plaintiff are inconsistent with the existence of such a contract. Shortly before General Cobb's death she acted as his agent in seeking a purchaser for the land. She corresponded with him and gave her views concerning the price for which the general could profitably sell the farm, and fully recognized his right to treat it as his own. She stated at the court house, when the will was read, that General Cobb had promised to leave her one-half of his estate. Her statements to Mrs. Macfarland, at all times before and after General Cobb's death, were with reference to a share of the estate, and at no time till months after General Cobb had passed away did she assert any contractual right to this land.

She sent General Cobb about $800 per annum apparently for the use of the land during the years she occupied it subsequent to her husband's death. In 1905 she wrote she was sorry she had not remitted what she ought to have sent from the farm. It may also be observed that, in the proceedings brought by her to collect from the estate the amount of her claim for money advanced to General Cobb, her counsel, Judge Harvey, was willing to concede a credit of $8,000, which is ignored in these proceedings.

At the time of the payment of the shortage, the land was worth, as near as can be judged from the testimony, from $12 to $18 an acre. It is a matter of common knowledge that following the panic, in 1896, farm lands in eastern Nebraska appreciated rapidly in value. It seems reasonable to believe that when General Cobb by his last will and testament in 1902 gave the boys and the mother one-half of the whole 1,240 acres, he believed that he was doing by them just as he had contemplated and given them to expect.

We have said that where it is sought to set aside the provisions of a will by proof of an oral agreement by which the property which is the subject of the will is otherwise disposed of the agreement must be established,

if at all, by clear, convincing, and satisfactory evidence. *Rau v. Rau,* 79 Neb. 694; *Teske v. Dittberner,* 65 Neb. 167, 70 Neb. 544; *Peterson v. Estate of Bauer,* 76 Neb. 652, 661. This is a sound rule, and the barrier afforded by it to a disposition of estates other than that intended by the owner in his lifetime should not be relaxed. This court has already gone to the limit in changing the disposition of property after the owners of it have passed away and are unable to help themselves. It is not the province of the courts to distribute estates as they think most just and equitable. Their sole function is not to decide what the deceased should have done, but to ascertain what he did in fact do, and in our opinion the quantum of proof required to establish the agreement alleged has not been produced.