MINERVA OVERLANDER ET AL., APPELLEES, V. PETER WARE
ET AL., APPELLEES: JOHN L. CLARK, APPELLANT.

FILED FEBRUARY 16, 1918. No. 19537.

1. **Specific Performance: PAROL AGREEMENT: PART PERFORMANCE:
STATUTE OF FRAUDS.** In an action for specific performance of an
oral agreement with a deceased person to convey land, *held*, that
not only must the terms of the contract be established by evidence
that is clear, satisfactory and unequivocal, but the work con-
stituting the performance required under the statute of frauds
must be such as is referable solely to the contract sought to be
enforced, and not such as might reasonably be referable to some
other and different contract or relation. Nothing will be con-
sidered as part performance which does not put the party into a
situation which is a fraud upon him unless the agreement be
fully performed. Equity interferes only to prevent fraud or un-
conscionable advantage.

2. **Evidence: DECLARATIONS OF DECEDENT.** Evidence of declarations of
a deceased person, concerning a parol contract, does not amount to
direct proof of the facts claimed to have been admitted by those
declarations. Such evidence, when not supported by other evidence,
is generally entitled to but little weight.

3. **Estoppel: ADMINISTRATION OF ESTATE: ELECTION TO TAKE AS HEIR.**
An heir who participates in an administration proceeding and
permits final decree therein, without asserting his claim to the
entire estate, will be held to have elected to take as heir and not
as owner, and is estopped from afterwards asserting ownership of
the entire estate.

APPEAL from the district court for Douglas county:
WILLIS G. SEARS, JUDGE. *Affirmed.*

*Alvin F. Johnson,* for appellant.

*Byron G. Burbank* and *Amos Thomas, contra.*

CORNISH, J.

On June 20, 1912, James B. Kelly, an unmarried
man, aged 72 years, died intestate. Three sisters, ten
nieces and seven nephews are his sole surviving heirs
and next of kin. Suit by certain of the heirs to par-
tition his 200 acres of land, making the daughter of

defendant John L. Clark also a party, for the purpose of quieting title to 80 acres of the land, some of the heirs having deeded an interest to her, which deed, it is alleged, had been procured by fraud. As the issues were joined, defendant Clark claims to be the owner of all the land under an alleged oral contract made in January, 1891, between Kelly and Clark's father, wherein Kelly promised that if Clark, then 10 or 11 years old, would come from Missouri to Douglas county and live with and care for him as a son would do, until he died, then Kelly would care for and educate him, and arrange it so that Clark would get all his estate when he died. He alleges performance upon his part, but that Kelly did not, pursuant to the oral agreement, afterwards affirmed and renewed with the said Clark, make any arrangements by which his property at the time of his death became vested in Clark. The other heirs deny the making of the contract, allege that Clark is estopped to assert it, and that, being oral, it is void as within the statute of frauds. The trial court found that no contract was made between Clark's father and Kelly by which Clark was to have all of Kelly's property, found that title to 80 acres of the land should be quieted in Clark, in accordance with an agreement had between Clark and Kelly, and that title to the remainder of the land should be quieted in the heirs. All parties appeal.

The evidence is voluminous. An extended discussion of it will not be attempted. We are of opinion that the decree of the trial court should be affirmed.

In considering cases of this character, where one is claiming the estate of a person deceased under an alleged oral contract, the evidence of such contract and the terms of it must be clear, satisfactory and unequivocal. Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable unless there has

been such performance as the law requires. The thing done, constituting performance, must be such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other and different contract—something that the claimant would not have done unless on account of the agreement and with the direct view to its performance—so that non-performance by the other party would amount to fraud upon him.

It appears from the evidence that Clark's mother died when he was three years old, leaving several children. The baby and some of the other children were distributed among relatives. The father throughout his life was a tenant farmer in indigent circumstances; all of the children having to work out as soon as they were able to work. Kelly was an intelligent, money-making farmer in Nebraska. He first took Clark to his home on request of Clark's older sister, who thought he was not receiving good treatment at the hands of his stepmother. He stayed with Kelly for a time, and after about a year, when he was 10 or 11 years old, went to remain with him. It was at this time, it is alleged, that the original contract was made with Clark's father.

It is the testimony of the relatives, some of them very well-to-do citizens in the community where the Clarks lived, that they never heard of the contract until this suit was commenced. There is not the first bit of direct evidence of the making of such contract. The deceased never made a will, or a deed, or a memorandum, or wrote a letter, or signed any instrument proving or tending to prove such promise. It is nowhere suggested that he desired to violate a contract fairly made. It would seem incredible that, in absence of a desire on his part to defeat Clark of his rights, he should never do anything to fix and make secure those rights. It would be his duty to do so; his common sense would tell him that it was necessary, and,

ordinarily a man would do so. Although frequently urged to make deeds of part of his estate, he refused to do it.

The inquiry arises whether, from the circumstances and relations of the parties, it is probable that Kelly would have made the promise, or whether it is unreasonable to believe that the claimant would have performed the service that he did in the absence of the promise. When Kelly took Clark the second time, the boy was glad to go back with him. The relatives approved. No such contract would have been necessary, because the boy was a burden. As a matter of fact, the most fortunate day in Clark's life, financially considered, was the one when his uncle said he could come and live with him. He did go and live with him, and under the supposed contract, wherein it is said that he was to devote his time and services to his uncle, it so happens that after 20 or 21 years of service Clark, still being a young man, is comparatively rich. Under the evidence and the decision of the trial court, he is the owner of 160 acres of valuable land in Douglas county, besides the personal property which he has accumulated while living with his uncle and since. It is apparent from the evidence that his uncle missed no opportunity for the boy's financial and educational improvement. This is not a case where, if we deny the claim, his work and service go unrequited.

On the other hand, it seems extremely improbable that a man of Kelly's shrewdness and ability would have entered into the contract at the time alleged. The father and relatives would be glad, and were glad, to have him take the boy. How imprudent a contract for a man to make under such circumstances, to pledge his whole present and future estate in such a way. It would be reasonable for him to promise to do well by the boy, to take him and help him and remember him when he died if he had been a good boy and faith-

ful to him, but further than that no prudent man would go under the circumstances. He did do that, and has done as much for Clark as ordinary men would do. Clark has no reason to complain of the situation. Kelly was on good terms with his relatives. There is no direct evidence of any quarrel with any of them. As often as once in three or four years he made them long visits.

If Clark had believed, when Kelly died, that under the contract he was the owner of all the property, it is natural to suppose that he would have at once made claim to it upon that ground, as he was in duty and law bound to do if such was his claim. Instead, he makes application that letters of administration be granted, and permits the estate to be administered before asserting his rights. In requesting other heirs to sign deed of the eighty, in accordance with what the trial court found to be the subsequent agreement had between himself and Kelly, he did not give as a reason why they should sign that he was already the owner of the entire property.

The contract and its terms were sought to be shown by some 11 witnesses who had heard Kelly make declarations in his lifetime, containing admissions bearing more or less upon the question. No doubt Kelly thought well of and was attached to Clark, and during the 20 or 21 years that Clark was with him the big-hearted man would occasionally say good things about him and what he intended to do for him, and the witnesses heard him talk. Much of the testimony dated back many years; and the witnesses' recollection of what was said was more or less indistinct in their memory. Much of it goes only to intent, and some of it is inconsistent with the existence of the contract alleged. Kelly refused to make a deed or a will, though frequently urged to do so, and finally promised to go and make a deed to the eighty, which he had promised

Clark he would give him if he stayed there with his wife, as soon as he was well enough to go.

It is held by the courts that such evidence is unsatisfactory in its character. "It never amounts to direct proof of the facts claimed to have been admitted by those declarations." *Johnson v. Quarles,* 46 Mo. 423, 427. 3 Jones' Commentaries on Evidence, sec. 432. See, also, *Kinney v. Murray,* 170 Mo. 674, 700, 706. In *Peterson v. Estate of Bauer,* 76 Neb. 652, 658, we quote approvingly from *Dicken v. McKinley,* 163 Ill. 318, as follows: "Such contracts are looked upon with suspicion, and are only sustained when established by the clearest and strongest evidence"—and also from *Kinney v. Murray, supra*: "But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character." So considered, the evidence as a whole does not sustain Clark's contention.

The attitude of Clark in participating in the administration proceedings and in permitting final decree therein, without asserting his rights to any part of the estate except the 80 acres, estops him from asserting ownership of the entire estate. As to that portion of the estate, it amounts to an election on his part to take as heir and not as owner.

We are of opinion that the evidence shows that, at the time Clark was married and was about to live with his wife apart from Kelly, it was agreed that if he would continue to live with Kelly he should have the 80 acres of land, the title to which was quieted in him by the trial judge.

The judgment of the trial court should be affirmed, the costs of this appeal to be paid by defendant John L. Clark.

AFFIRMED.

SEDGWICK, J., not sitting.

Dean, J., dissenting.

The testimony of 11 disinterested witnesses seems to establish these material facts: First, that Kelly's declarations, made during a period of 21 years, disclose that he made an oral agreement with John Clark's father for John's services, and in consideration therefor he agreed that all of his property at his death was to become the property of John Clark; second, that John Clark, in reliance thereon, fully performed all of the services that the agreement contemplated he was to perform, and that the services so rendered are referable to that agreement; third, that Kelly for 21 years accepted the services rendered by John Clark, and thereby affirmed and acquiesced in the agreement; fourth, that Kelly never made a statement that is inconsistent with his often expressed declaration, made mostly to farmer neighbors whom he had known from 10 to 30 years, that all of his property at his death was to become the property of Clark; fifth, that Kelly died without having performed his part of the agreement.

Dr. Murphy was Mr. Kelly's physician and intimate friend for more than 15 years. He testified that Kelly told him that he lived alone, and "that he made an agreement with John Clark's father that, if John would come and live with him until he died, he should have everything on God's green earth that he had, and he said that many times," and that Kelly said "he went to Missouri after him. * * * I don't believe there has been a year that I have not heard Jim Kelly state the contract he made with John Clark's father." To another Kelly said he told Clark's father that, "if they would let Johnny come and stay with me, * * * when I died I would give him all that I had." To another, in speaking about renting the farm: "I would not rent it for more than one year at a time because * * * when I die everything goes to John, and he can do as he pleases with it. * * * I promised to give him eve-

rything I had, and I am going to live up to my contract.''
To another Kelly gave a like answer when asked about
selling the farm.   Another testified: ''He said him
and John had been trading, and that he tried to beat
John in the trade.   He said John has pretty ———
good judgment.   He said he traded with John the
same as he would with anybody else, because he ex-
pected John to have what he had when he got through
with it, and he wanted to know that he would know
enough to take care of it.''   To another he made the
same statement, and added: ''He was going to leave
John all his property, and he wanted to see if he
could be cheated out of it.''   Two witnesses said that
Kelly's declarations were made in Clark's presence.
*Hannemann v. Ott,* 98 Neb. 492; *Harrison v. Harrison,*
80 Neb. 103; *O'Connor v. Waters,* 88 Neb. 224.   Clark
married 6 years before Kelly died.   He brought his
wife to the humble home, and there with their children
they all lived and toiled together until the aged uncle
died.

William H. Kerr, a neighbor, testified that he stayed
over-night at Kelly's home about a year before Clark's
marriage, and that Kelly said: ''He told me in John
Clark's presence that he wanted John to get married.
*   *   *   It would make it more comfortable for them
if there was a woman in the house to keep house for
them.   He said if he done that, and stayed with him,
that he would give him everything at his death. * * *
He told me that he took John Clark when he was
about seven years to raise him, and he said he told
his father,   *   *   *   if he would let him take that boy
and raise him, he would give him a good education
and give him everything at his death.   *   *   *   Told
me that that evening, in the presence of John Clark.''
This testimony supports the allegations of Clark's
answer and cross-petition with respect to the parol
renewal by Kelly with Clark of the 1891 agreement
from time to time that, in consideration of Clark con-

tinuing to care for Kelly and continuing to live with
him, Kelly would leave all his property to Clark at
his death. Almost it seems that the judgment of the
learned trial court, and its affirmance here, is based
upon unrelated fragments of testimony, rather than
on the weight of testimony.

The cross-appellants charge that Clark fraudulently
obtained a deed from 14 of their number conveying
their interest in 80 acres of the land to his minor
daughter, Mary Clark, and that they executed the deed
in pursuance of false representations made to them
by Clark to the effect that it was his uncle's dying
request that Mary have the 80-acre tract. In proof of
this they introduced in evidence a series of letters
written by Clark to certain of their number. Clark
contends, and the proof seems to show, that the letters
were written in pursuance of a proposed compromise
settlement tendered to him by some of the cross-ap-
pellants, and which provided that, if all cross-ap-
pellants would join in the settlement and execute the
deed, he would relinquish his claim to the remainder
of the estate. The agreement was not consummated
because only 14 cross-appellants would sign the deed,
the remaining 5 refusing to sign. The agreement was
afterwards repudiated by the 14 persons who signed
the deed, and Clark acquiesced in the repudiation. The
letters seem fairly to disclose an endeavor by Clark
to fulfil his part of the agreement for settlement. All
of Clark's references in the letters to any alleged dying
request, or any request of his uncle, relate to state-
ments that Mr. Ware and Mrs. Long attribute to Mr.
Kelly as having been made by him shortly before he
died about making a deed, and in one instance only
two hours before that event. Mr. Ware is a husband
of Kelly's deceased sister; Mrs. Long is a sister of
Kelly; and Mrs. Kelly is the wife of a deceased bro-
ther. They are all directly or indirectly interested in
the suit. Mrs. Long is a cross-appellant. The children

of Mr. Ware and the children of Mrs. Kelly are cross-appellants. The three persons named all came together from their respective Missouri homes, and arrived at the Kelly home 24 hours before their aged kinsman died, and were with him at the moment of final dissolution. It does not appear that Clark was present and heard any of the alleged statements of his dying uncle.

The letters are all addressed to certain of the cross-appellants, and relate in part to the visit of the three relatives. They were written in September, October, and November, 1912. In one Clark reports Mr. Ware as saying that, on the day his uncle died, "the last thing he ever said to anyone except the nurse, he told uncle John Ware that he felt so much better he was going to town in two or three days and make out a deed to me." In his deposition Mr. Ware denied hearing Mr. Kelly say that; but admitted that Mr. Kelly told him only two hours before he died "that he was going to leave Dolly a home." Dolly was Mr. Kelly's pet name for Clark's daughter Mary. It appears, however, in Mrs. Long's deposition that Mr. Ware told some members of his family on his return from the Kelly obsequies that Mr. Kelly told him in his last moments that he was going to give 80 acres to John Clark or to Mary. In the same letter Clark said that "Uncle had told him and several of the neighbors he was going to leave everything to me and Mary." In view of Clark's daughter being then in her second year and Clark a man of 31, it would seem that no one except Clark could be heard to complain of this statement as relating to any contract except that of 1891. Naturally there must have been some confusion among the stricken relatives as they anxiously waited at the bedside of their dying kinsman for the whispered word that was to direct the disposition of his estate. Small wonder if they did not accurately recall his statements.

The rule is well settled in Nebraska that even a will cannot divert the disposition of property in a proper case where a promisee has performed his part of a contract that provides the promisor is to convey. Much less can it be done orally. Clark cannot be held to have waived his claim to the estate by negotiating with the cross-appellants for a compromise settlement. In the present case the parties by mutuality of agreement, no matter by whom initiated, created a situation that was repudiated by one party. The other acquiesced in the repudiation. The former status of both seems thereby to have been restored. 16 Cyc. 725.

The argument that Clark is estopped from maintaining his action, and that his agreement to accept a part of the land as a compromise settlement constitutes an election and an abandonment of his claim to the estate, does not seem to be clearly supported by the record nor by the law. Clark made no election. The deed that was made by some of the cross-appellants to Clark's infant daughter was in pursuance of the proposed compromise settlement, and to avoid litigation. The cross-appellants are in no worse position now by any act of Clark's of which they complain than they were before some of them executed the deed that all of them have since repudiated. The probate proceedings and the actions to quiet title were begun by Clark in pursuance of the proposed settlement, and both of the latter actions were dismissed when the proposed settlement was abandoned by the cross-appellants. In any event the estate would have to be probated. In no respect does Clark seem to be either compromised or estopped. An election is generally held to be some decisive act that will so change the status of the parties with reference to the property or the rights involved that they cannot be restored to their former situation. In the present case there was no change of status. Clark was the owner of all of

the property from the time that his uncle died. The fact that the cross-appellants made claims that do not seem to be sustained should not be held to work to Clark's injury. It was while the proceedings for settlement were pending that Clark upon the advice of counsel applied to the county court of Douglas county for administration of the estate. That did not prejudice Clark. *Cobb v. Macfarland*, 87 Neb. 408.

Kelly never made a will, and the record tells why. He could read and write some, but was illiterate. It is not shown that he ever wrote a letter. Not long before he died Dr. Murphy advised him to make a will. Kelly answered: "I have seen so many wills, and the lawyers make them and then break them up, and there is no one in this bottom but knows I always said John Clark should have everything I have on God's green earth when I die." And that in speaking of lawyers he said: "He hated them; and the people here know, and we have always done our business together, and that he should have everything, as the contract that I made with his father." He preferred to rely on the trusted friends of many years to see that the only kinsman who helped to accumulate the estate should, as he expressed it, "have everything I have on God's green earth when I die."

All of Kelly's next of kin, 20 in number, are participating in this suit. Of these, John Clark, the son of Kelly's deceased sister, is the only one that ever assisted him in accumulating the property, and according to Kelly's statements the only one of his relatives that contributed to his comfort. Kelly's often expressed declaration that Clark "should have everything that he had" was prompted by a fine sense of honor and of justice. When his nephew came to live with him he had 160 acres of farm land almost void of improvements. Substantial improvements were afterwards added. After Clark had lived and worked with him about ten years Kelly bought an additional

40 acres, and it now forms a part of the 200-acre tract that cross-appellants seek to partition. On this point comment may be spared.

The rule seems to be well settled in this state that a parol contract to convey land will be specifically enforced where the testimony shows that the promisee has performed his part of the contract in good faith, and such contract, as against the estate of a promisor who subsequently died, may be proved by witnesses who testify to declarations made by the promisor. Where property rights have attached in pursuance of a rule that has been long adhered to, or where reliance is placed upon a rule with respect to the conveyance of property, such rule should not be lightly revoked. The following citations in this and other jurisdictions seem to be fairly in point: *Kofka v. Rosicky,* 41 Neb. 328; *Johnson v. Riseberg,* 90 Neb. 217; *Moline v. Carlson,* 92 Neb. 419; *Damkroeger v. James,* 95 Neb. 784; *Peterson v. Bauer,* 83 Neb. 405; *Bevington v. Bevington,* 133 Ia. 351, 9 L. R. A. n. s. 508; *Francis v. Francis,* 180 Ia. 1191; *Laughnan v. Laughnan,* 165 Wis. 348; *Drager v. Scegert,* 138 Minn. 6; *Hespin v. Wendeln,* 85 Neb. 172. In *Cobb v. Macfarland,* 87 Neb. 408, the agreement to convey was proved solely by the declarations of decedent. The *Cobb* case is particularly in point.

Excepting Clark alone, Kelly expressed an aversion for all of his relatives. He told two witnesses that they should not have a penny of his money. When he was ill his physician asked him why he did not send for his nearest relatives, and he said, "I don't want them. * * * All they come for is to raise ——."

Is it at all improbable that Kelly would have made an agreement that contemplated the active assistance and companionship of a robust nephew of ten years? Was it for him an imprudent agreement? In view of Kelly's situation in 1891, being then a bachelor of

who had always lived alone on a 160-acre farm in a little one-room cabin, was it either an improbable or an imprudent agreement? The main opinion seems in part to base the decision on the fact that from a financial viewpoint it was fortunate for Clark that he went to live with his uncle. Clark was a poor boy, but it will not of course be therefore assumed that his only avenue to fortune lay in the direction of Kelly's home. But these are merely incidents. It seems that the function of the court should end when it discovers and declares what the decedent in fact did, and not what the court believes he ought to have done. In view of the record and the law applying thereto, it seems that Kelly's agreement with John Clark's father should be specifically enforced. In *Peterson v. Bauer*, 83 Neb. 405, it is well said: "Whether an oral contract to devise realty shall be enforced by specific performance after it has been performed by plaintiff depends upon the facts and circumstances of each case." This lone and childless man had good reason to look upon Clark as the logical and the natural object of his bounty. And this aside from the fact that he was the only kinsman who was the companion of his middle age and the support of his declining years. Under the rule, John Clark may not speak for himself, but 21 years of faithful service and every declaration of James Kelly speaks for him.

The argument that the relatives, "some of them very well-to-do citizens," never heard of the 1891 contract upon which Clark relies until this suit was commenced, if established, would be corroborative of Kelly's declarations of his lack of interest in them. But the record shows that by counsel's statement the relatives knew before October 1913 that Clark claimed the entire Kelly estate. The record contains nearly 1,500 pages. More than 40 witnesses testified, and of these 21 by deposition, so that as to them our opportunity

to judge of their qualifications as witnesses equals that of the trial court.

I respectfully submit that neither the record nor the law seems to sustain the opinion that has been adopted by the majority.

HAMER, J., dissenting.

While I join in Judge Dean's dissent, additional thoughts are suggested by the record. There appears to have been an arrangement between the parties for a compromise. This arrangement was never carried out. The deed was never signed by all the parties. Anticipating that it would be signed, the plaintiff appears to have filed a petition for a partition. As the arrangement for a compromise was never carried out, this incident should not be considered on the merits of the case. The majority opinion appears to make much of certain things done or attempted to be done by the plaintiff under the proposed compromise. I submit that these things ought not to be used against the plaintiff, as he is in no sense bound by a compromise contemplated but never carried out. The petition filed in the district court for Douglas county July 19, 1913, was brought by John L. Clark as guardian and next friend of Mary V. Clark, a minor, v. Peter Ware, Anna Ware, his wife, Katherine Miller and John Miller, her husband, William B. Colliter, Lena C. Pella, John Pella, her husband, James Broyles and Hattie Broyles, his wife. It would extend this opinion to an unwarrantable length to recite the contents of the foregoing paper, and also other papers that were filed in contemplation of the compromise having been made. There appears also to have been a petition filed in the district court for Douglas county in which John L. Clark and Floy E. Clark, his wife, were plaintiffs against Minerva Overlander, Rufus B. Overlander, her husband, Martha Forsee and John B. Forsee, her husband, and others. The object of the above petition appears to have been to confirm the shares of the parties mentioned therein

and for a partition of the realty described according to the respective rights of the parties, or that the realty be sold and the proceeds divided. I quote from the majority opinion: "It is the testimony of the relatives * * * that they never heard of the contract until this suit was commenced." This particular suit was commenced on July 23, 1914. There must be some mistake about this, because the cross-appellants filed an answer in the district court for Douglas county October 17, 1913, in a proceeding between the same parties and concerning the same property involved in this suit. It was verified by the present attorney for the cross-appellants, as I understand it. In that answer, which is in evidence in this case, it is pleaded "that said John Clark falsely and fraudulently represented that he, the said Clark, was entitled to all the real estate left by said James B. Kelly, which was 200 acres." Of course the attorney may have conferred with his clients before verifying the pleading. While they did not verify this answer, counsel for them did verify it. He probably did not know except by communicating with them.

In *Shuman v. Willets*, 17 Neb. 478, this court held: "Where a contract in relation to real estate has been deliberately entered into by competent parties, and is not open to objection of fraud, undue means, etc., in obtaining it, a court of equity will carry out the intention of the parties by specifically enforcing its obligations." In that case this court cited *Gartrell v. Stafford,* 12 Neb. 545; *Vindquest v. Perky,* 16 Neb. 284; *Greenaway v. Adams,* 12 Ves. Jr. (Eng.) 395; *King v. Hamilton,* 4 Pet. (U. S.) *311. It also cited *Hall v. Warren,* 9 Ves. Jr. (Eng.) 608, quoting what Sir William Grant said, that "supposing the contract to have been entered into by a competent party, and to be in the nature and circumstances of it unobjectionable, it is as much of course in this court to decree a specific performance, as it is to give damages at law."

An examination of the decisions seems to sustain the contention made.

In *Hartman v. Streitz,* 17 Neb. 557, there was no contract in writing. So, also, in *Stevens v. Cooper,* 2 Neb. 373, and *Hughes v. Reese,* 22 Neb. 78. In *Palmer v. Palmer,* 114 Mich. 509, a farmer gave his son a bond for a deed of one-half of his 80-acre farm, conditioned upon the son living at home and working the farm, and the payment of a certain sum. Along the same line are *Hanlon v. Wilson,* 10 Neb. 138; *Ford v. Steele,* 31 Neb. 521; *Dawson v. McFaddin,* 22 Neb. 131; *Neale v. Neales,* 9 Wall. (U. S.) 1; *Guynn v. McCauley,* 32 Ark. 97; *Willard v. Tayloe,* 8 Wall. (U. S.) 557; *Young v. Young,* 51 N. J. Eq. 491.

In *Laccy v. Zeigler,* 98 Neb. 380, the action was for specific performance, and there was a decree which awarded the plaintiff specific performance of an alleged parol agreement by which Charles W. Zeigler agreed that he would at his death give to the plaintiff $5,000 in money, and the home place in the city of Columbus, and certain household furniture, in consideration that the plaintiff would devote her time and attention to caring for and nursing said Zeigler and keeping house for him as long as he should live. It was admitted that the plaintiff was in possession of the home place, but it was claimed that her possession was acquired after the death of Zeigler and by fraud, and that it was maintained by force, also that the contract was not in writing, and that the estate was solvent. The court found for the plaintiff and quieted and confirmed her title, and in addition directed that the administrator pay to the plaintiff from the assets of the estate $5,390, with interest.

In *Anderson v. Estate of Akins,* 99 Neb. 630, it was alleged that "services were rendered by plaintiff at the request of the deceased, 'who promised and agreed to pay plaintiff for the same,'" and it was held that such allegation was "supported by proof that the

deceased promised to convey or devise certain property in payment for services rendered, but refused or neglected to perform such agreement." In the body of the opinion it is said: "The objection that it was necessary under this allegation to prove an express contract fixing the price to be paid is without merit." The facts were that the plaintiff with his mother resided with the deceased from the infancy of the plaintiff, and both were supported as members of the family. When the plaintiff became of age he was about to seek employment for himself, but at the request of the deceased he remained and continued with the deceased for about 15 years, working on the farm and assisting in the accumulation of the property which was held by the deceased at the time of his death. The action was a law action, and the plaintiff recovered. It is similar to the case at bar in the fact that the deceased neglected to convey or devise the property to the plaintiff. The case supports the claim of the plaintiff, because it is held that the plaintiff was entitled to recover for the services performed. It is perhaps immaterial, so far as the principle is concerned, whether a law action was brought or an action for specific performance, as in the instant case.