ANNA L. SMITH, APPELLANT, V. JOHN RAUBACH ET AL., ADMINISTRATORS, ET AL., APPELLEES.
ANNA L. SMITH, APPELLEE, V. JOHN RAUBACH ET AL., ADMINISTRATORS, ET AL., APPELLANTS: KNOX COUNTY BANK ET AL., APPELLEES.

FILED OCTOBER 9, 1931. NOS. 27806, 27808.

*Webb Rice,* for appellant.

*Shurtleff & Spillman, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOOD, J.

These two appeals are from the same judgment but by different parties. The action from which the appeals were taken was, in part, one to compel completion of performance of an alleged oral contract and, in part, for specific performance of the same contract. The alleged contract was between the plaintiff and Adolph Svoboda, now deceased. Defendants are the heirs-at-law of Svoboda and the administrators of his estate, together with other parties to the commercial paper involved in this action.

Plaintiff alleged that in June, 1925, Svoboda "proposed to plaintiff that she should look after his home for him by keeping it in order and doing his scrubbing and laundry work, and that she further furnish him meals at her house as he might require them, and that she generally look out for his welfare and care for him and nurse him if necessary until the time of his death, and that in return he would convey to plaintiff his residence heretofore described and further give or bequeath to plaintiff sufficient of his personal estate to care for her during the remainder of her lifetime. In this connection plaintiff avers that the exact amount of personalty promised to her by said Svoboda was not stated but that he did offer her and promise her on sundry occasions during the remainder of the year 1925, and thereafter, the exact dates plaintiff being now

unable to state, that he would give her enough so 'she would be well taken care of,' that he would 'leave her enough to keep her for the rest of her life,' that he would 'leave her more than half of his estate,' that he would 'leave her all of his estate,' and plaintiff avers that said Svoboda stated and represented to her that he was possessed of personal property of the value of from $25,000 to $30,000 and that said statements were true. Plaintiff avers that by said statements she was led to believe and did believe that said Svoboda was offering her his residence and not less than $12,500 additional of personalty and probably much more and so believing she accepted said offers of said Adolph Svoboda and proceeded to furnish his meals for him as he desired them which was about half of the time, and to look after and scrub and cleanse his dwelling and to do his laundry work for him and to care for his garden and to mow his lawn and to see that he was cleaned and bathed if occasion required which became more and more frequent and during the last year of his life required almost daily attention on the part of plaintiff because of weaknesses of advanced age on the part of said Svoboda, by reason of which many of his personal habits became those of a small child."

Plaintiff further averred that on September 15, 1928, Svoboda, in fulfilment of his promise, gave and delivered to plaintiff a promissory note and five certificates of deposit, in all of which Svoboda was designated as payee; that the face of the promissory note was $1,500, and that the aggregate amount of the certificates was $13,772; that Svoboda neglected to assign or indorse the promissory note and the certificates of deposit. Plaintiff prayed that the court order said certificates and note to be duly assigned to her and for a decree requiring the conveyance to plaintiff of Svoboda's residence property.

The banks issuing the certificates of deposit and the makers of the promissory note were made parties, and each answered, admitting the indebtedness and a willingness to pay the obligations to whomsoever might be determined to be lawfully entitled thereto. The children of Mr. Svoboda

and his administrators denied the making of the oral contract and averred that Svoboda was mentally incompetent to make the contract, and denied that the certificates of deposit and promissory note were delivered by Svoboda to the plaintiff.

The trial court found for plaintiff on the question that such a contract had been entered into; found and determined that $6,500 was sufficient to keep her for the remainder of her life; and found specifically that the certificates of deposit and note were not delivered to plaintiff by Svoboda with the intention of conveying title to her. From the judgments entered upon the findings, plaintiff perfected an appeal, and the children of Svoboda and the administrators of his estate have also perfected a separate appeal.

This court has on numerous occasions held that contracts of the character of that involved in this appeal will be upheld and enforced if they are established by evidence that is clear, convincing and satisfactory. Among the many authorities so holding are the following: *Labs v. Labs,* 92 Neb. 378; *Overlander v. Ware,* 102 Neb. 216; *Powers v. Norton,* 103 Neb. 761; *Remaly v. Sweet,* 106 Neb. 327; *McEntarffer v. Payne,* 107 Neb. 169; *Young v. Gillen,* 108 Neb. 311; *Hajek v. Hajek,* 108 Neb. 503. The principal question involved herein is: Does the evidence meet these requirements? The record is voluminous, and only a summary of the facts can be set forth herein.

Adolph Svoboda was of Bohemian birth. He had lived in Knox county for a great many years and had acquired and accumulated considerable holdings of land and money. He was twice married. By his first marriage there were eleven children, two of whom died in childhood or infancy, and nine survived him. His first wife died in 1915. Some time thereafter he contracted another matrimonial alliance, which was terminated in divorce proceedings. From the record it appears that practically all of his holdings of land and personal property were acquired by the assistance of his first wife and their children; that the children worked upon the farms as soon as they were able and con-

tinued to do so until they had attained the age of 17 years, or upwards; that they were required to work in the fields until after cornpicking in the autumn, and to quit school as soon as spring work on the farm began. Apparently, none of the children acquired any education reaching beyond the fifth grade. It appears that Svoboda was saving, economical, almost penurious; that to his children, who are all now grown, he gave nothing of any consequence save to one son, to whom he gave 280 acres of land, upon condition that the son would pay to him annually during the remainder of his life the sum of $400, and he also sold to the son 200 acres more at the price at which he had purchased, and which was perhaps much less than its actual value at the time that he sold to the favored son.

Some time in 1925 Svoboda purchased a small home in the city of Norfolk, consisting of a lot and a four-room cottage, without any modern conveniences therein. This house was adjacent to that owned by plaintiff. It appears that, at the time, plaintiff was keeping some boarders, and that, within a few weeks after Svoboda moved into his new home, he took some meals at plaintiff's house. Plaintiff's son testified that, within two or three weeks after he came there, Svoboda proposed to his mother that she furnish him meals as he should need them, and care for him and look after his home; that his mother at first did not accept because she was contemplating moving to Ohio, to care for an invalid sister, but that a few days later the subject was renewed between Svoboda and plaintiff and that he made the offer to give to plaintiff his home property and sufficient of his estate to take care of her for life, if she would undertake to furnish him his meals and look after him and care for his home. To some extent the wife of this son corroborated him. However, her testimony did not go to the same extent; nor was it in full corroboration of the testimony of her husband. There was evidence on behalf of plaintiff that she furnished meals to Mr. Svoboda in her home and carried meals to him when he was ill; that she cared for him personally; did his laundry work and cleaned and cared for his home.

One witness on behalf of plaintiff testified on cross-examination that she heard a conversation between Svoboda and the plaintiff wherein he objected to paying her $1 a day for the service she was rendering, saying that it was too much; that she heard a like conversation between them on two or three different occasions. This was testimony given by plaintiff's own witness. There was further evidence, on behalf of plaintiff, of many witnesses who had heard Mr. Svoboda state, in effect, that plaintiff was giving him good care; that he intended to give her the property where he lived, and to leave her sufficient so that she would not have to work; that she would be taken care of in her old age, and like statements. None of these statements referred to any contract or agreement between Mr. Svoboda and the plaintiff. On the other hand, there was evidence that the man who sold the home to Mr. Svoboda lived in the house with him for nearly a year thereafter; that Svoboda "batched" and got his own meals. Another of plaintiff's witnesses testified that Mr. Svoboda bought milk of him. Another witness for plaintiff, a grocer, testified to the fact that Mr. Svoboda purchased groceries of him from time to time. There was evidence from other witnesses that Mr. Svoboda was in the hospital on three different occasions, on two of which he was there for three weeks or thereabouts, and another for a somewhat shorter period; that at other times, between 1925 and his death, which occurred September 16, 1928, he spent considerable time with his sons and daughters in their homes some distance from Norfolk. On some of these occasions, according to the testimony, he was absent from his Norfolk home for two or three months, or possibly longer. There was evidence that his sons and sons-in-law furnished him with vegetables and meat from time to time, and that some of them, when visiting him, found the old gentleman getting his own meals. There was testimony by a number of witnesses that on different occasions Mr. Svoboda had stated that plaintiff was paid up to a certain date, or that he desired a bill changed so that he could pay her for the services she had rendered up to the particular week-end. Pos-

sibly some of this evidence may have been incompetent to prove payment, but we think it was competent as tending to show a circumstance inconsistent with the charge that he had entered into a previous contract and was to pay her at the end of his life with a large proportion of his property.

It is also shown in the record that in September, 1928, when Svoboda was upon his deathbed he requested plaintiff to write a letter to some of his children, asking them to come and take him to the hospital where he could have proper care and treatment. Plaintiff wrote this letter for him apparently on the 12th of September. Mr. Svoboda died on the morning of the 16th. The letter was not mailed by her until the day of his death, and possibly not until after his death. It is further disclosed that on the evening preceding his death plaintiff sent for a doctor; that the doctor came and Mr. Svoboda inquired of him whether he was going to get well. The doctor, after examining him, informed him, in effect, that the chances were that he would not recover, and stated that if he had any business to transact it should be attended to, and that if he had any relatives they should be notified. The doctor testified that Svoboda said he wanted to give his home property to the plaintiff; that the doctor informed him it would be necessary for him to make a deed, or a will, and suggested that he have some one draw a will for him. An attorney was sent for; he arrived about 11 o'clock that night and prepared a form of will, but it was not signed. The attorney testified that Mr. Svoboda refused to sign it and said: "That woman (referring to plaintiff) has had enough." There was other testimony that Mr. Svoboda said he was too tired and weak to sign the will and asked to be left alone, but stated that it was his last will and testament. There was evidence that on the same evening, and before the attorney arrived, Svoboda asked for the plaintiff and that she came to his room; that he requested her to take out from under his pillow a sweater, or jacket, and that from a pocket therein was taken a manila wrapper, and that Svoboda handed this to the plaintiff. There

was some dispute in the testimony as to just what he said at the time. There was evidence to the effect that he said for her to keep it and not let any one get it. The record discloses that plaintiff took the envelope and shortly afterwards went to her home. She and her son testified that the wrapper was opened and that it contained the five certificates of deposit, together with the promissory note heretofore mentioned. Plaintiff and her son both testified that the certificates of deposit were pinned together; that, in addition thereto, there was a slip of paper on which were written the name and address of the plaintiff, and signed with the signature of Svoboda. On the day preceding his death Mr. Svoboda had sent for his banker and had him examine into a wrapper, somewhat similar to and perhaps the same one, containing certificates of deposit. He had two or three of these taken out and asked the banker to send them to the banks issuing them, for renewal and for some change in the name of the payee. The banker testified that at that time the certificates of deposit were not pinned together, and that there was no writing contained therein. On the day of, or within a day or so following, the death there was a conversation between the plaintiff and some of the relatives of Svoboda, in which she was asked about the certificates of deposit, and she denied having seen or knowing anything about them. On redirect examination plaintiff stated that she said she *had not seen them in Svoboda's house,* but she refrained from disclosing the fact that she had received or knew anything about them.

From the outline of the evidence given herein and other evidence in the record, it appears that the making of such a liberal contract on the part of Mr. Svoboda is at variance with his life habits. Moreover, if it was made it was upon a very short acquaintance and before he could have known plaintiff very well. It seems to be highly improbable and unreasonable. The discrepancies in the testimony of plaintiff and her witnesses are such as to cause grave doubt as to the credibility of their testimony. Suffice it to say that the evidence is not satisfactory and convincing that such a contract was ever made.

We have not considered nor given any attention to the proposition as to whether Mr. Svoboda was mentally competent to make such a contract. The evidence upon that point is in irreconcilable conflict. The conclusion above reached, however, renders it unnecessary to further consider that question.

From what has been said, it follows that the judgment of the district court should be and is reversed, and the action of plaintiff dismissed. This opinion disposes of both appeals.

REVERSED AND DISMISSED.