HARRY RUDOLPH, APPELLANT, v. WALTER A. HARTUNG, PERSONAL REPRESENTATIVE OF THE ESTATE OF CHARLES C. MCDANIEL, DECEASED, ET AL., APPELLEES.

277 N. W. 2d 60

Filed March 20, 1979. No. 41957.

James T. Gleason of Collins & Gleason, for appellant.

Dixon G. Adams, for appellees.

Heard before BOSLAUGH, BRODKEY, and WHITE, JJ., and SPENCER, Retired Justice, and COADY, District Judge.

SPENCER, Retired Justice.

This is an action for specific performance of an oral contract to execute a will permitting plaintiff, Harry Rudolph, to purchase farmland at a specific price. After hearing, plaintiff's petition was dismissed. Two questions are presented by Rudolph's appeal. (1) Was there an agreement to execute a will? (2) If so, was there sufficient performance to remove the contract from the statute of frauds? We affirm.

Rudolph became a tenant on the Charles McDaniel farm in Sarpy County in late 1953. The farm consisted of 210 acres, divided by the Rock Island Railroad. A tract of 63 acres lying north and west of the railroad is the area involved herein.

Rudolph claims sometime in the late summer of 1974, in the presence of his son Earl, he made an agreement with McDaniel to erect a building with

the understanding that sometime the land on which it was set would be his. Rudolph testified McDaniel, who was then past 80 years of age and living with an older sister, said "he would be glad to see the building put up. That we could reach an agreement that he would go ahead and take care of details. That it would be specified in his will that I could go ahead and purchase this."

Plaintiff's testimony was that he would have bought the ground at that time if he could have. McDaniel, however, said "he wants to own the property as long as he lives." They discussed a price but didn't know the exact acres. They thought it was 52 or 53 acres. They agreed on a price of $100,000. They had discussed a price of $2,000 an acre, but rounded it off at $100,000 when McDaniel said $4,000 or $6,000 wouldn't make any difference. Rudolph testified "He told me he would specify in his will that this portion should be entitled to me at his death."

Plaintiff testified he told McDaniel "if I couldn't be guaranteed of having the site in years to come, that I would go look for a different site to put my building on." The building was to be a machine shop so that he and his son, who had attended agricultural-mechanical school at Curtis, Nebraska, could do their own work and could operate a machine shop.

Earl Rudolph testified he and his father talked to McDaniel about purchase of the land. He was asked if they wanted to purchase it outright. His testimony was: "A- We would have been very open to that. This is what we had thought about trying to buy it at that time. And Charlie said, 'No, I own it until I die.' Q- And as the discussion continued, you finally agreed on a price of $2,000 an acre for approximately 53 acres, or rounding off to a $100,000. And when were you to buy the ground? A- Upon his death through the estate. Q- And did Charlie

say anything about putting that in his will?  A-  He made one statement: 'I'll take care of it.'  Q- Did you subsequently have any further conversation or take part in any conversation between your Dad and Charlie and yourself regarding the agreement on the land?  A-  Yes, we had one conversation after that which I was in on and that was in the shop as it was being erected.  He come up and stated it was a real nice building, happy to see you put it up.  And we asked him at that time if he had thought anything more about it or if he was going to do anything about it and that, and he says yes.  He says, 'I agreed that you will be able to purchase this parcel of land in discussion here for the set price.'  And he says, 'After my death.  I will take care of it.' "

William Dohse, a lifelong friend of McDaniel, testified that in July of 1975, he asked a question about the new building and McDaniel responded, " 'Oh, that's Harry's.  It belongs to Harry and you'll have to ask him for more information.' "  Dohse could not remember any further details about the conversation.

Web Warren, an insurance agent who insured McDaniel's buildings, testified he noticed the new building and asked McDaniel about it.  Charlie told him he had given Harry permission to put up the building because he, Harry, was going to get the rest of the buildings anyway.  He did not write any insurance on it because Harry had his insurance with another company.

There were two houses on the place, a big one in which Charlie and his sister lived, and a smaller one in which the Rudolph family lived.  Rudolph had put several buildings on the place in addition to the machine shop.  Some were grain storage bins and the others were machine sheds to house his machinery.  Nothing appears in the record to indicate what agreement may have been made about these buildings, if any.

Charlie McDaniel died February 9, 1977, when he was close to 86 years of age. He was survived by a sister and several nephews and nieces. His last will and testament, dated September 18, 1968, was admitted to probate. His nephew, Walter A. Hartung, was appointed as the personal representative of the estate.

Walter and his brother Albert both testified Rudolph talked to them about buying this portion of the farm after their uncle's death, but made no mention of any agreement, nor was any price mentioned. Rudolph confirmed this conversation and admits he did not say anything about any agreement. He only told them he wanted to buy a portion of the farm. About 2 weeks later, when the Hartungs visited with Rudolph, he told them Charlie had said he could have it for $100,000. Walter told him he had better see attorney Adams as he couldn't think of selling it at that price.

Neither Walter nor Albert had ever heard about any agreement previously. Nor had Lulu, Charlie's surviving sister, ever mentioned it. They were unable to find any memorandum of any kind among Charlie's papers referring to any agreement to sell. They did find a letter from a Robert Corn, dated May 5, 1973, offering $4,000 per acre for the farm. This is a little over a year previous to the alleged agreement. The will offered for probate was found in McDaniel's safe deposit box. The bank records indicate Charlie McDaniel had been in the box several times after the alleged agreement in 1974.

An oral agreement to make a will is unenforceable under the statute of frauds, section 36-105, R. R. S. 1943. However, nothing contained in sections 36-101 to 36-106, R. R. S. 1943, shall be construed to bridge the powers of a court of equity to compel specific performance of agreements in cases of part performance. § 36-106, R. R. S. 1943.

It is well settled that one seeking specific per-

formance of an oral contract for the conveyance of real estate has the burden of proving by a preponderance of the evidence a contract that is clear, satisfactory, and unequivocal in its terms. Busteed v. Sheffield, 153 Neb. 253, 44 N. W. 2d 471 (1950).

We are in full agreement with the following statement found in Annotation, 69 A. L. R. 16: "It is very proper that the assertion of such a contract, especially when it is claimed to be entirely in parol, should be regarded by the court with grave suspicion, and the establishment thereof required by evidence which clearly indicates the minds of the parties met upon the terms of the contract sought to be established."

Rudolph is seeking to enforce an alleged oral agreement to sell the 63 acres, which was thought to be only 53 or 54 acres, for $2,000 an acre rounded off to $100,000. If we correctly interpret Rudolph's present position, he is willing to pay $2,000 an acre for 63 acres, or $126,000. The transaction was to be accomplished by putting a provision in a will expressing the agreement. The agreement is strictly oral. There is no direct corroboration of it. The testimony of the disinterested witnesses, which does not mention any such agreement, can as readily be explained by other theories.

We have repeatedly held in similar situations that in order to enforce an oral contract for the conveyance of a part of the estate of a deceased person the evidence of the contract and its terms must be clear and satisfactory; and the thing done constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be referable to some other and different contract. See Lintz v. Apking, 145 Neb. 714, 18 N. W. 2d 55 (1945).

Rudolph testified unless he had obtained an agreement he would have built the machine shop elsewhere. He spent $9,000 in its construction. The rec-

ord would indicate if there was an agreed price of $2,000 per acre, it was at least $1,500 per acre, or $94,500 less than had been offered the year previously. We are persuaded that if the facts and circumstances do not sufficiently indicate the existence of the contract the court should not allow equivocal parol evidence to supply its terms.

Plaintiff had previously constructed several other buildings on the property which were not involved in any specific agreements except such as might be inferred from his tenancy. The reasonable inference is that McDaniel had no objection to the erection of buildings on the property. The testimony of Warren, the insurance agent, is that McDaniel considered these buildings to be the tenant's, and the tenant maintained his own insurance on them. There is nothing in this relationship which would prove an agreement to sell.

We are puzzled by the fact that if the agreement was as definite as plaintiff testifies, some provision was not mentioned about the older sister who was living in the big house on the premises with McDaniel. The sale of the land to Rudolph would have involved the sale of the houses on the land.

Both the Rudolphs testified that McDaniel helped them in the shop after it was built. It does seem out of character for McDaniel not to have made a new will if that was his agreement, or at least to have visited about it with his sister who helped him with his financial affairs. All witnesses confirm he was a man of his word and had a very friendly relationship with the Rudolph family.

Everyone seems to agree McDaniel did not want to sell the property. For some reason he kept the written copy of the offer of $4,000 per acre which was made the year previous to the alleged agreement. It does not appear in character for him to have agreed to a $2,000 figure without some mention of the previous offer.

The implication in the testimony is that Rudolph would have given up his tenancy if the agreement had not been made. He was actually farming the Dohse land as well as the McDaniel farm. He could have put up the building on another site and still farmed the McDaniel land as well as the Dohse farm. In addition to farming Rudolph was operating a cattle feeding business. McDaniel wanted no part of it because of his age. He let Rudolph do so without any change in the annual rent, which was 60-40 grain rent plus $75 for a 17-acre pasture.

It does seem a little strange none of the parties realized there were actually 63 acres in the tract rather than 52 or 53 as supposed by Rudolph. In his approach to the Hartungs about the agreement, he said he had an offer to purchase for $100,000. The price agreed on was never too definitely established. From the record it seems to be if there were 52, 53, or 54 acres, the price was to be $100,000. If it was more, the price was $2,000 per acre.

We have a problem with the fact that if a contract was made, Rudolph never inquired after the building was erected as to what McDaniel had done to effectuate the agreement. It seems some mention would have been made about it or some memorandum would have been drawn over a period of almost 3 years, particularly when McDaniel was around the premises every day.

The part performance necessary to render an oral contract to make a will enforceable must be referable solely to the oral agreement. Overlander v. Ware, 102 Neb. 216, 166 N. W. 611 (1918). The fact that Rudolph had erected other buildings on the premises without some specific agreement other than consent would seem to raise a question as to whether the erection of the machine shop is referable solely to the alleged agreement.

An appeal in an equity case is tried de novo in the Supreme Court. § 25-1925, R. R. S. 1943. However,

as we said in Bailey v. Mahr, 199 Neb. 29, 255 N. W. 2d 866 (1977): "Equity cases are heard de novo by this court. In determining, however, the weight to be given the evidence. this court will consider the fact that the trial court observed the witnesses and their manner of testifying." On the record we cannot say the trial judge was wrong in dismissing the petition.

The record indicates that Rudolph has filed a $30,000 claim for the building, which is being held in abeyance pending the outcome of this case. The attorney for the estate stated in open court the estate made no claim to the building and had no objection to its removal from the premises. No attempt is being made herein to deprive the plaintiff of his property. The estate contends the plaintiff will suffer no loss when his claim is processed in county court.

The judgment of the District Court is affirmed.

AFFIRMED.