ESTATE OF JESS H. QUINN, DECEASED, GERALD KRANAU and THE GOTHENBURG STATE BANK AND TRUST COMPANY, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Quinn v. Commissioner
Docket No. 3465-79.
United States Tax Court
T.C. Memo 1982-32; 1982 Tax Ct. Memo LEXIS 711; 43 T.C.M. (CCH) 352; T.C.M. (RIA) 82032; January 28, 1982. Gary L. Scritsmier and Donald H. Kelley, for the petitioners. J. Anthony Hoefer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in Federal estate tax of the estate of Jess H. Quinn, deceased, Gerald Kranau and the Gothenburg State Bank and Trust Company, co-executors, in the amount of $ 189,051.70. By amendment to answer respondent alleged that the proper deficiency in estate tax for Mr. Quinn's estate was $ 284,953.88. The issues for decision are: (1) whether there was a binding option contract between decedent and his son-in-law which either fixes the value for Federal estate tax purposes of certain pieces of real property owned by decedent at the date of his death or which entitles the estate to a deduction under section 2053(a)(3), [1] and (2) if there was no such binding option agreement, the fair market value of these pieces of real property on August 18, 1975, the date of decedent's death. *713 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Gerald Kranau and the Gothenburg State Bank and Trust Company, co-executors of the estate of Jess H. Quinn, filed a Federal estate tax return with the Internal Revenue Service Center, Ogden, Utah, on May 18, 1976. At the time the petition was filed in this case, petitioner Gerald Kranau (Kranau) resided in Gothenburg, Nebraska, and the Gothenburg State Bank and Trust Company (the bank), a corporation, had its principal place of business in Gothenburg, Nebraska. The decedent, Jess H. Quinn (Quinn) died testate on August 18, 1975. He was the widower of Harriet Quinn, who died July 21, 1975, and he was survived by four daughters, Mary Buddenberg, Harriet Johnson, Dorothy Lowe, and Janet Kranau. Janet Kranau is the wife of Gerald Kranau. At the time of his death, decedent owned, among other assets, the following described real property: The East Half of the Northeast Quarter (E 1/2 of NE 1/4) of Section Thirty-six (36), Township Eleven (11) North, Range Twenty-six (26), West of the 6th P.M., in Lincoln County, Nebraska. An undivided one-half interest in Section Twenty-five (25), Township *714 Eleven (11) North, Range Twenty-six (26), West of the 6th P.M., in Lincoln County, Nebraska. This property constituted Quinn's farm. At the end of 1958, after completing his tour of duty with the Air Force, Kranau came to work for Quinn on Quinn's farm. In 1955 Kranau had graduated from the University of Nebraska with a bachelor of science degree in general agriculture. In 1955 Kranau married Janet Kranau, Quinn's daughter. In 1956 Kranau was commissioned as a second lieutenant in the Air Force as a result of his participation in the R.O.T.C. program while at the University of Nebraska. While in the Air Force, Kranau served as a pilot in a troop carrier outfit. Prior to coming to work for Quinn, Kranau had discussed with Quinn the possibility of purchasing some of his land at a later date when he was financially able to do so. In his first year of work for Quinn, Kranau was paid a wage of $ 100 per week. Quinn at that time had three other hired hands who worked on his farm. Two of these hired hands who lived in homes on the farm were each paid wages of $ 75 per week. The other hired hand, who did not live on the farm, was paid a wage of $ 100 per week. Kranau also did *715 not live on the farm but instead commuted there each day. Over the years Kranau's salary was increased. In 1964 or 1965 his salary was about $ 8,900 a year. In 1965 Kranau and Quinn changed the arrangement by entering into a sharecropping agreement. At the time of entering into the sharecropping arrangement, Kranau purchased Quinn's corn-farming equipment. Quinn was 66 years old at the time Kranau first came to work for him in 1958. Quinn had been primarily interested in cattle feeding, although parts of his farm were used for raising feed for the livestock. In 1968 after Kranau had been farming several years on a sharecropping agreement, he discussed with Quinn the purchasing of some of Quinn's land. Quinn was unwilling to part with the land during his lifetime. Quinn and Kranau discussed the idea of Quinn's placing a provision in his will that Kranau would have the right to purchase land from Quinn's estate after Quinn's death. On August 16, 1968, Quinn executed a will. The will contained a marital deduction clause under which Quinn left an amount equal to 50 percent of his adjusted gross estate as determined for Federal estate tax purposes to his wife Harriet. The *716 executrix under the will (who was to the Quinn's wife Harriet, or alternatively, if she was not able to serve as executrix, two other individuals were to serve as co-executors) was to select the property from Quinn's estate which would go outright to Harriet so as to qualify for the marital deduction. The remainder of Quinn's estate was to go to Harriet for her use during her lifetime, with the remainder interest in such property to then go to Quinn's four daughters, equally as tenants in common. However, in the event Quinn's wife did not survive him, all of the estate was to go to the four children as tenants in common, share and share alike. On May 9, 1969, Quinn executed a first codicil to the August 16, 1968, will. The codicil contained the following pertinent provisions: I, JESS QUINN, of the County of Dawson, State of Nebraska, having made my Last Will and Testament dated the 16th day of August, 1968, do hereby make, publish and declare this to be the First Codicil to the same. FIRST. If, at my death, I am the owner of the following described real estate, to-wit: The East Half of the Northeast Quarter (E 1/2 of NE 1/4) of Section Thirty-six (36), Township Eleven *717 (11) North, Range Twenty-six (26), West of the 6th P.M., in Lincoln County, Nebraska. An undivided one-half interest in Section Twenty-five (25), Township Eleven (11) North, Range Twenty-six (26), West of the 6th P.M., in Lincoln County, Nebraska, and pasture land, I hereby grant my son-in-law, Gerald Kranau, and my daughter, Janet Kranau, the option to purchase all of said land, upon the following prices, to-wit: All pasture land, at the rate of Eighty-five Dollars ($ 85.00) per acre. The balance of the real estate, all specifically described above, at the rate of Seven Hundred Dollars ($ 700.00) per acre. SECOND. Said Gerald Kranau and Janet Kranau, if they elect to so purchase said real estate, shall exercise said election, by filing a formal written election to so purchase, within three months after the admission of my Will and this Codicil to probate. Said purchase shall become effective as of the 1st day of March, following said election. If at the time of the said purchase, there are any unpaid real estate taxes which are a lien upon said real estate, they shall be paid by my estate. If said Gerald Kranau and Janet Kranau so elect to purchase said real estate, *718 I hereby authorize and empower my executrix, and alternate executor, or any administrator with will annexed, to sell and make deeds of conveyance conveying said real estate to said Gerald Kranau and Janet Kranau, Husband and Wife, in the manner directed by them. THIRD: This option shall only be effective in the event both said Gerald Kranau and Janet Kranau survive me. The codicil in all other respects confirmed and revived the August 16, 1968, will. On April 8, 1975, Quinn executed a second codicil which ratified and republished the August 16, 1968, will and the May 9, 1969, first codicil. The only change made by the second codicil was that it nominated and appointed Kranau and the bank to serve as executors of Quinn's estate. At the time this second codicil was drafted, Quinn told the president of the bank that he did not want to put the burden of being executrix on his wife, Harriet, and that the two alternate executors probably were not now available to serve. One of these alternates was the attorney who drafted the will. This attorney had retired from private practice to become a judge. The other alternate was the CPA who had done his tax work. This CPA lived 100 *719 miles away from Gothenburg. Quinn stated that he did not wish to otherwise change his will or the first codicil to his will. Quinn died on August 18, 1975. On November 13, 1975, the Nebraska State Court admitted the August 16, 1968, will, with the first and second codicils to such will, to probate and also approved the appointment of Kranau and the bank as co-executors of the estate of decedent. In a pleading entitled "Exercise of Option" which was dated November 17, 1975, and filed in the Nebraska State Court, Kranau and his wife, Janet, gave notice of their election to exercise the option contained in the first codicil. By a warranty deed dated March 1, 1976, the co-executors of the estate conveyed the property which is the subject of this case to Krauau and his wife, Janet. The deed recited that the conveyance was in consideration of $ 450,083.70 received from the Kranaus. On the Federal estate tax return filed for decedent's estate, the real property constituting Quinn's farm was reported at a value as of the date of Quinn's death of $ 450,020. The return contained the following statement: All of real estate described [below], subject to a fully performed oral contract *720 to purchase, included at the contract price of $ 85.00 per acre for the pastureland and $ 700.00 per acre for the farmground, which amount has been paid to the estate in satisfaction of the contract. The return then proceeded to specify which portions of the real property were farmland and which were pastureland. In his statutory notice respondent determined a deficiency of $ 189,051.70 against the estate. The statutory notice contained the following statement: It is determined that the option prices listed in the first codicil to the decedent's will, dated May 9, 1969, are not controlling for purposes of valuation in the decedent's federal estate tax return. The statutory notice further stated that the real property was determined to have a fair market value of $ 1,001,150 at the date of decedent's death. Respondent in an amended answer alleged that the real property had a fair market value at the date of decedent's death of $ 1,058,321.50. Respondent in his amendment to his answer alleged that there was a deficiency in estate tax of $ 284,953.88 and made claim for an increased deficiency. OPINION It is well settled that *721 a binding agreement made by a decedent to sell property for a stated price may fix the value of the property subject to the agreement for Federal estate tax purposes. [2] In order to have this effect, the agreement must (1) restrict disposition of the property during decedent's lifetime and by decedent's estate, and (2) have been entered into for bona fide nontestamentary reasons. Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-41 (1977) (holding that mandatory buy-sell provision in partnership agreement fixed value of decedent's partnership interest); Estate of Fiorito v. Commissioner, 33 T.C. 440 (1959). See also section 20.2031-2(h), Estate Tax Regs., which is made applicable to business interests other than stock by section 20.2031-3(c) of the same regulations. *722 It is petitioner's contention that there was a binding, enforceable option contract between Kranau and Quinn which restricted decedent's ability to dispose of the property during his life. Kranau testified at trial that back in 1957 he had agreed to come to work on decedent's farm in return for an opportunity to buy the farm "when able." Kranau testified that in 1968 when he discussed the subject of his purchasing the farm, Quinn informed him that he would like to retain the farm during his lifetime. However, according to Kranau, Quinn proposed that Kranau be given an option to buy the farm from Quinn's estate after Quinn's death. Kranau further testified that he and Quinn then negotiated the option price which is found in the first codicil to the will. Such codicil, according to Kranau's testimony, was executed by decedent to put into effect the agreement between Kranau and decedent. The agreement, according to petitioner, was a strict business arrangement under which decedent obtained Kranau's services in operating and managing the farm. Respondent's position is that even assuming an agreement between Kranau and decedent, the agreement would have been unenforceable because *723 of the operation of the Nebraska Statute of Frauds, Reissue Revised Statutes of Nebraska 1943, section 36-105, [3] which provides that a contract for the sale of real property shall be void unless the contract or some note or memorandum thereof is in writing and signed by the party against whom enforcement is sought. The Nebraska statutes in section 36-106[4] specifically recognize a part-performance exception to the Statute of Frauds. But in order to utilize this exception, the Nebraska courts have required the party seeking enforcement of an oral agreement to meet the following requirements: (1) the oral agreement must be established by clear, satisfactory and unequivocal evidence, (2) the part performance must be such that is solely referable to the alleged contract sought to be enforced and not to some other contract or relation, and (3) the part performance must also be something which the claimant would not have done except for the contract so that nonperformance by the other party would amount *724 to fraud upon him. Theobald v. Agee, 276 N.W.2d 191 (1979). Respondent contends that petitioner has not established that the agreement would come within such exception so as to be enforceable and thereby restrict the ability of decedent to convey away the property during his lifetime. *725 Upon considering the evidence, we conclude that petitioner has failed to show the existence of the asserted contract between decedent and Kranau, much less established that the contract would have been enforceable as a result of coming under the part performance exception to the Nebraska Statute of Frauds. The terms of the option created under the first codicil do not coincide with but differ in material respects from the terms of the agreement testified to by petitioner Kranau. The first paragraph of the first codicil states that if decedent at the date of his death is the owner of the real estate, he grants to Kranau and his daughter, Janet Kranau, the option to purchase the land. The third paragraph of the first codicil requires that both Kranau and Kranau's wife must survive decedent.Further, the codicil provides that both Kranau and his wife must exercise the option and that title to the property will be conveyed to both. Kranau, in his testimony, acknowledged that these provisions were not his agreement with decedent. However, Kranau did nothing to explain the discrepancy other than to claim that he had not seen the first codicil until after decedent's death and was not *726 aware of these provisions until such time. Earlier in his testimony, though, Kranau related that shortly after he and decedent had negotiated the option price for which he could purchase the property after decedent's death, in May or so of 1969, he had asked decedent what steps he had taken to implement the agreement.According to Kranau, decedent informed him that he had gone to see his lawyer and executed the agreement in writing and, in fact, was surprised that Kranau had not received a copy of the agreement. Since the option clearly was a matter of great importance to Kranau, it seems surprising to us that from 1969 to decedent's death he took no further steps to learn about the terms contained in the document decedent had executed. While decedent may have stated that he intended to leave the property to Kranau or even gone so far as to promise to do so, such an understanding still falls short of a contract which would legally restrict decedent from conveying away the property during his lifetime. The option created under the first codicil to the will therefore is more in the nature of a testamentary disposition to Kranau and Kranau's wife than the result of a contractual arrangement *727 between Kranau and decedent. If there was a bona fide business arrangement between Kranau and decedent, there would have been no reason to condition Kranau's having the option upon both he and his wife surviving decedent. This is especially true since the record shows that Kranau's wife had no role in operating or managing the farm, although on occasion she did help out. In addition to the testimony of Kranau, petitioner offered the testimony of the president of the bank. According to the president of the bank, decedent within the year prior to his death on several occasions had discussed with him the provisions contained in the will, including the provisions contained in the first codicil. The bank president related that decedent had told him that to change the option provisions of the first codicil would break the agreement he had with Kranau and his daughter Janet. Decedent had also informed the witness that his wife and all his daughters had been informed of the option arrangement and had expressed no disagreement with it. This testimony, upon examination, is inconsistent with petitioner's assertion of a binding contract between Kranau and decedent. Decedent in his discussions, *728 according to the testimony given, referred to the option as his agreement with Kranau and his daughter Janet. We hold that petitioner has failed to show the existence of the alleged contract. [5] The only evidence presented by petitioner on this issue was the testimony of Kranau and the president of the bank. For the reasons stated above, we conclude from such testimony that there was not a contract. There were other individuals who might have shed light on the existence of the alleged contract but who were not called as witnesses by petitioner. These individuals include the attorney who drafted the first codicil for decedent and any of decedent's four daughters. Petitioner, who bears the burden of proof on this matter, Rule 142(a), Tax Court Rules of Practice and Procedure, failed to call any of these people. Thus, after weighing the evidence presented, we find that there was no binding option contract between decedent and Kranau.Since no such contract existed, the price set forth in the first codicil to decedent's will does not fix the value of the real property for Federal estate tax purposes. See Hoffman v. Commissioner,2 T.C. 1160, 1179 (1943), affd. *729 on other issues, 148 F.2d 285 (9th Cir. 1945); Matthews v. Commissioner,3 T.C. 525, 528-529 (1944). *730 Our finding that there was no enforceable contract between decedent and Kranau disposes of petitioner's alternative contention that the difference between the fair market value of the farm property and the option price for the property can be deducted as a claim against the estate under section 2053(a)(3). Petitioner, in making this argument, is urging that the spread between the option price and the fair market value of the property could be viewed as compensation to the son-in-law for services rendered. There is authority to the effect that a bequest which is in the nature of compensation for services rendered, may be deducted by the estate under section 2053(a)(3). See Wolder v. Commissioner,493 F.2d 608 (2d Cir. 1974), affg. a Memorandum Opinion of this Court. See also discussion in Beecher v. United States,280 F.2d 202 (3d Cir. 1960). The rationale of these cases is that the recipient of the bequest is essentially a creditor. If decedent had breached his agreement to leave such bequest, the recipient could have sued the estate either for damages or to enforce the claim. Any such recovery from the estate, assuming the claim was based *731 on adequate consideration in money or money's worth, would clearly be deductible. Section 2053(a)(3) and section 2053(c)(1)(A); section 20.2053-4, Estate Tax Regs. However, by its terms the statute requires that in order for such a claim to be deductible, it must be a claim allowable by the law of the state. Since we have found that there was no enforceable contract between decedent and his son-in-law, Kranau would not have had at any time a claim as a creditor against decedent or the estate. Since the option arrangement contained in the first codicil to the will does not fix the value of the property for Federal estate tax purposes, we must determine the fair market value of such property on the date of decedent's death. Section 20.2031-1(b), Estate Tax Regs. The regulation defines fair market value as the price at which the subject property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Based on the opinions of the two expert witnesses who testified in the case, we conclude that the property owned in fee by decedent had a value of $ 1,350 per acre *732 for the farmland and $ 200 per acre for the pastureland at the date of his death. The parties are in agreement as to which portions of the real property consisted of farmland and which portions consisted of pastureland. Such specification was contained in the Federal estate tax return and respondent's expert in his report came to the same categorization. We have based our conclusion on a consideration of all the sales of other properties in the area of the subject property which were used by the two expert witnesses adjusted in some instances for the difference between prices at the time of sale and the valuation date here involved. For the farmland we considered a sale in 1977 at a price per acre of $ 1,847 to be the sale of land most comparable to the subject farmland property. However, we agree with petitioner's contention that a substantial adjustment is required because this sale occurred two years after the valuation date of the subject property. In making the necessary adjustment, we have considered the statistical survey of annual increases in Nebraska farm prices as well as the other evidence in the record of price increases between 1975 and 1977. For the pastureland, *733 we have considered all the sales placed in the record by the expert witnesses of the parties. The farmland in which decedent owned an undivided one-half interest and a value of $ 600 per acre at the date of decedent's death. We arrived at this value by halving the $ 1,350 price per acre and allowing a further discount since decedent had a fractional interest. Thus, we find that the property had a fair market value of $ 896,108 on the date of decedent's death. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Such agreements are to be distinguished from an option where the holder only has a right of first refusal. Since the estate need not sell if it does not desire to, the stated price cannot fix the value of the property for Federal estate tax purposes. Estate of Reynolds v. Commissioner, 55 T.C. 172, 189-190 (1970); Estate of Mundy v. Commissioner, T.C. Memo. 1976-395↩.
3. Sec. 36-105, Reissue Revised Statutes of Nebraska 1943, provides as follows: 36-105. Contracts for lease or sale of lands; when void.Every contract for the leasing for a longer period than one year, or for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party by whom the lease or sale is to be made. ↩
4. Sec. 36-106, Reissue Revised Statutes of Nebraska 1943, states: 36-106. Contracts for lease or sale of lands; specific performance. Nothing contained in sections 36-101 to 36-106 shall be construed to abridge the powers of a court of equity to compel the specific performance of agreements in cases of part performance.↩
5. Our finding here does not require us to determine whether the alleged contract would be enforceable in spite of the Nebraska Statute of Frauds. However, because the parties have on brief extensively argued the issue, we deem it appropriate to make the following observations. The Nebraska Supreme Court in Rudolph v. Hartung,277 N.W.2d 60, 63 (1979), stated as follows concerning enforcement of an oral contract to convey real estate: It is very proper that the assertion of such a contract, especially when it is claimed to be entirely in parol, should be regarded by the court with grave suspicion, and the establishment thereof required by evidence which clearly indicates the minds of the parties met upon the terms of the contract sought to be established. Further, in our view a Nebraska State court would not have found the claimed performance by Kranau to be solely referable to the alleged contract. In Ross v. Ross,219 N.W.2d 756 (1974), a husband and wife had occupied the farm owned by the husband's mother. During the four-year period of their occupancy, the two kept all income from the farm but paid neither rent nor the real estate taxes on the property. However, the two did make improvements to the property. In sustaining the decision of the lower court denying specific performance of the alleged contract to purchase the farm, the Supreme Court of Nebraska noted that acts of performance relied on by the plaintiff could be attributed to considerations of present use along with the possibility of an inheritance or gift as well as to a contract to purchase. Riley v. Riley,33 N.W.2d 525 (1948), cited by petitioner is distinguishable. In Riley, the father and son were estranged for a number of years prior to the son returning to operate the father's farm. Thus, it was very unlikely that the son would have agreed to work for the father without the father having contracted to leave the farm to the son in his will when he died. Petitioner for the first time on reply brief contended that the first codicil was a sufficient memorandum of the agreement to remove the asserted contract from the operation of the Statute of Frauds. We have found no Nebraska case expressly so holding, nor has petitioner cited any such case. But see Brown v. Webster, 134 N.W. 185 (1912); Geiger v. Geiger,178 N.W.2d 575 (1970). Nevertheless, there seems to be no reason why a will cannot constitute a writing such as will satisfy the Statute of Frauds. See of this Corbinon Contracts, Statute of Frauds, Sec. 509, and Annotation, 94 ALR.2d 921↩. So for argument's sake we will assume that such could be so under Nebraska law. However, even under cases of other states expressly permitting this, the will is required either to refer to the contract or no contain terms which coincide with those of the asserted contract. The first codicil in the present case does neither of these things. Thus, in our view, a Nebraska court would not find the first codicil to be a sufficient memorandum. The codicil was drafted for decedent by his attorney. It would be very surprising that the attorney, if he had been told that the codicil was to serve as a memorandum of a contract between decedent and his son-in-law, would have omitted to mention such contract or at least taken other measures to avoid any problems with the Statute of Frauds.