JOHN J. MATTHEWS ET AL., APPELLEES, V. PETER P. MATTHEWS ET AL., APPELLANTS.

341 N.W.2d 584

November 28, 1983. No. 82-615.

Daniel D. Jewell and Dennis W. Collins of Jewell, Otte, Gatz & Collins, for appellants.

Vince Kirby, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

This case presents an appeal from the decree of the District Court which, after a bench trial, granted the plaintiffs-appellees, John and Dorothy Matthews, husband and wife, and their son James, specific performance of an alleged oral contract between them and John's deceased uncle, Tom Matthews. That court impressed a trust upon certain Holt County farmland and ordered that a deed be executed by the clerk of the District Court to John and Dorothy. Defendants-appellants, the personal representative and devisees under Tom Matthews' will, a document which makes no provision for the plaintiffs, appeal from that decree. We reverse and dismiss.

The defendants assign a number of errors; however, due to the approach we take, we need consider only one of them. That operative assignment is that the District Court erred because the evidence was insufficient to support its decree.

An action to compel the specific performance of an oral contract to devise real property by will is equitable in nature and is reviewed de novo on the record on appeal to this court. *Yates v. Grosh*, 213 Neb. 164, 328 N.W.2d 200 (1982); *In re Estate of Layton*, 212 Neb. 518, 323 N.W.2d 817 (1982). We also bear in mind that the trial judge, who decided this matter without benefit of a jury, had the opportunity to view and hear the witnesses as they testified, and,

accordingly, we give weight to his determinations of their credibility. *Spilinek v. Spilinek, ante* p. 35, 337 N.W.2d 122 (1983).

More importantly, we are required to regard with grave suspicion any claim of an oral contract to devise property by will, and must, in our de novo review of the record, discover clear, satisfactory, and unequivocal evidence of the existence of the alleged oral contract and its terms. *Yates v. Grosh, supra; Rudolph v. Hartung,* 202 Neb. 678, 277 N.W.2d 60 (1979).

The facts in this case are, for the most part, not in dispute. Tom and Leo Matthews, brothers, were born and raised on a farm near O'Neill, Nebraska, in Holt County. Each took up farming as his occupation, and eventually married. Tom fathered two children. Unfortunately, they, along with his wife, predeceased him. Leo and his wife, who both predeceased Tom as well, are survived by six children. Those children, nieces and nephews of Tom, include the plaintiff John Matthews and the defendants Peter Matthews, Catherine Kazda, and Cecelia Campbell. Two of Leo's other children, Gene Matthews and Leo (Fritz) Matthews, are not parties to this action.

John, Fritz, Gene, and Peter helped both their father and their uncle farm the land in Holt County. Tom rarely paid his nephews for their help, but on numerous occasions, beginning in the early 1950s, informed his nephews that they would receive some of his farmland when he died. Fritz gave up farming in 1955, and thereafter only occasionally helped Tom. He now lives in Bellevue, Nebraska. Gene quit working for Tom in 1966 when he married and moved out of Holt County. Peter and John, at the time of trial, lived in the O'Neill area and operated farms in Holt County.

In the early 1950s John and his wife, Dorothy, moved into a house on one of Tom's quarter sections and began to farm that quarter section on a share-

crop basis. By the early 1960s John was farming five quarter sections of Tom's land on such a basis. In 1962, or thereabout, John and Dorothy tired of living in the house on Tom's property and Tom moved a different house onto the land. This house was given to Dorothy by her father. However, Tom paid the moving expenses and also paid to have the basement and foundation constructed for the house. Dorothy and John allege that at this time Tom renewed an earlier promise to leave to them, by his will, the quarter section upon which the house stood. However, this is not the promise sued upon.

In 1966 or 1967 Tom moved into his brother Leo's home, who was then a widower. In 1969 or 1970 Leo requested that Tom leave his home because Tom refused to contribute to the household expenses. At that time Tom moved into John and Dorothy's home.

Tom stayed with John and Dorothy for 9 years. During his stay, Tom suffered periodic bouts of incontinency and general failing health, not uncommon phenomena for a man approaching 90 years of age. John, Dorothy, and their children tended to Tom's needs by cooking his meals, cleaning up after him, and transporting him on his errands. In 1979 John overheard a conversation between Tom and John's sister, in which Tom expressed his intent of moving from John and Dorothy's home. John called his brother, Fritz, in Bellevue and expressed his concerns about Tom's ability to care for himself. Fritz initiated conservatorship proceedings in the Holt County Court, and John was named special conservator pending a hearing. The conservatorship petition was dismissed when the county court determined that Tom was able to handle his own affairs.

Tom moved from John and Dorothy's home shortly after the conservatorship petition was filed. He stayed for a short time with his niece Catherine Kazda, and subsequently moved to his nephew Peter's home, where he resided until his death in 1980. In 1979, after he had moved from the plain-

tiffs' home, Tom requested that John and Dorothy either pay rent to him for their use of the house or move. They moved prior to Tom's death.

Tom Matthews executed several testamentary documents over his lifetime. In 1970, shortly after he took up residence with John and Dorothy, Tom executed a will, leaving three quarter sections and a half section of farmland to John. The remainder of his farmland was devised to Tom's other nephews, Peter, Fritz, and Gene. In 1972 Tom executed another will, leaving only two quarter sections and a half section of his farmland to John, and the rest to Fritz and Peter. In 1978 Tom again changed his will, this time leaving two quarter sections to John, one quarter section to John's son James, and the rest of his estate to his sister, Mary Williams, his nephew Peter, and his niece Cecelia Campbell and her husband. In 1979 Tom executed a codicil to his will, revoking the 1978 dispositions to John and James. In 1980, shortly before his death, Tom executed a will under which the defendants in this action are the devisees. The 1980 will makes no provision for the plaintiffs.

After the 1980 will was admitted to probate, the plaintiffs commenced this action. In their final amended petition they alleged that prior to 1968 Tom promised John, Dorothy, and James that if they would agree to render certain personal services to him, he would agree to make a devise to them of certain of his real property. They further alleged that they undertook to render those personal services in 1969 by taking him into their home and that, thereafter, Tom and the plaintiffs entered into an oral contract whereby Tom would devise to them three quarter sections and a half section of Holt County farmland in return for the plaintiffs' looking after his needs, supplying him with a home, and taking care of his livestock for as long as Tom requested or required such.

In support of their allegations of the existence of

such a contract, plaintiffs direct our attention to the provisions of the revoked 1970 will in which John is devised three quarter sections and a half section of land. John contends that this will was executed shortly after the lifetime care agreement was reached. The 1970 will makes no mention of the agreement, and the attorney who drafted this will testified at trial that Tom never mentioned an agreement with John when the will was prepared. It is apparent that by as early as 1972, when Tom revoked the 1970 will, he obviously did not consider himself bound by an agreement to the plaintiffs even though he was still enjoying their hospitality.

The plaintiffs can direct us to no written evidence of or document memorializing the agreement. The only evidence of the existence of such a contract and its terms is the testimony of the plaintiffs. Their testimony is not corroborated by that of any other witness. Even accepting the fact that the trial judge obviously placed credence in their testimony and, thus, accepted it as true, we do not find that testimony sufficient to support their claims.

Both John and Dorothy testified that when they initially took Tom into their home, there was no agreement between them. They both testified that the agreement arose only after they commenced looking to Tom's needs. As such, their testimony contradicts the allegations in their petition, wherein they contend that an agreement was reached prior to Tom's taking up residence with them.

As to the agreement which allegedly arose after John and Dorothy commenced caring for Tom, our review of the record reveals many equivocal and contradictory statements which leave us uncertain that one even existed, let alone what the terms of such an alleged agreement might have been.

In response to a question about the agreement, Dorothy stated in a deposition taken in connection with the case: ''A Yes, and he had come to live with us, he said, and we wouldn't have to worry

about anything. He would leave us the place and stuff, for, you know, being there. Q Okay, did he say that to you before he moved into your house? A No, afterward. He always talked about it. We didn't have to worry, that he was going to leave us his land because we was good to him. Q Did he ever say to you, 'You have to take care of me'? A No, he had never ever said we had to take care of him. Q Did he every say — strike that. Was his promise to give you this land the same promise he had made roughly since 1951 when you were married? A Yes, pretty well the same. Q The number of acres or quarters was the only change? A Yes, I suppose.''

And, further, in her deposition Dorothy offered this testimony while being questioned by her attorney: ''Q Well, there again Mrs. Matthews, you expected that he would give you the property if you looked after him, is that correct? A Well, I suppose. I didn't figure he would really have to give me anything to look after him because I, you know, I am that kind of person. I took care of him anyhow, but I just hoped some day that he would leave us something for being good to him, but not because I· took care of him. I didn't expect anything. Q Then again, isn't it a fact that he says, 'If you will look after me', when he came down from Pete's, he said, isn't it true, 'If you will look after me I will give you this land'? A I guess so. I get kind of confused.''

John's testimony is riddled with similar contradictions. We also note that John was living rent free in a house on Tom's land. After Tom went to live with John and Dorothy, Tom gave John $4,000 to buy some land. The $4,000 was never repaid. John paid no rent for the use of Tom's cattle pasture.

*In re Estate of Layton*, 212 Neb. 518, 323 N.W.2d 817 (1982), a case involving an oral contract to devise property by will, reiterated our long-standing rule that in order to remove such a contract from the operation of the statute of frauds, there must be

performance referable solely to the contract sought to be enforced such that nonperformance by the other party would constitute a fraud upon the claimant. In doing so, we quoted from *O'Neal v. First Trust Co.*, 160 Neb. 469, 70 N.W.2d 466 (1955): " ' "The thing done, constituting performance, must be such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other and different contract—something that the claimant would not have done unless on account of the agreement and with the direct view to its performance—so that nonperformance by the other party would amount to fraud upon him." ' " 212 Neb. at 524, 323 N.W.2d at 821.

As we found earlier, Tom had been making statements of his intentions to give land to his family since at least the early 1950s. There were reiterations of these intentions when Tom moved the house onto the quarter section which served as John and Dorothy's home. The plaintiffs testify to so many agreements between Tom and themselves that we cannot conclude that taking care of Tom was solely referable to the one alleged in their amended petition. Furthermore, the evidence demonstrates it is just as likely that the care and home the plaintiffs bestowed on Tom was the result of feelings of kinship and not that of a contractual obligation. The evidence is uncontradicted that John and Dorothy initially took Tom into their home prior to entering into any contract for his care. In John's deposition we find these statements: "Q Now, you told Vince the only reason you took him in was because he promised to give you the land. A Yes, he promised me. Q There are no other reasons that you took him in besides that? A What other reasons do you mean? Q You didn't take him in because he was your uncle? A I took him in some, sure, blood you would. Q So that isn't the only reason, is it? A What? Q The fact you were going to get some property from him when he died? A What do you

mean by that? Q The only reason you took him in, it wasn't — there isn't just one reason you took him in, is there? A I took him in because I liked the man. Q He was your uncle and he was your blood relation, isn't that right? A He was an uncle. Q And is not blood relation? A He is blood relation. Q And weren't those some of the reasons that you took him in? A Well, not necessarily. I wouldn't say it was. Q You say you like him and that was one of the reasons you took him in? A I got along with him 28 years I worked there."

Not only is the evidence unclear and equivocal that a contract existed between Tom and the plaintiffs, it appears that the performance shown to make that oral contract enforceable could be attributed to other agreements or simply to family affection.

The one fact which is clear from the evidence is that Tom's vague expressions of intent and constant changes in his plans for the disposition of his estate allowed him to manipulate his nieces and nephews. The evidence, however, falls far short of clearly, satisfactorily, and unequivocally establishing the contract alleged by the plaintiffs.

REVERSED AND DISMISSED.